[No. A052943. First Dist., Div. One. Apr. 28, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND WESLEY TRIMBLE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The portions directed to be published follow.

COUNSEL

Charles Bush, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Laurence K. Sullivan and Linda James, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

NEWSOM, J.—Appellant was convicted after a jury trial of second degree murder (Pen. Code, § 187).[1] The trial court found true a special allegation that appellant suffered a prior serious felony conviction in Oregon within the meaning of section 667, subdivision (a). He was sentenced to a state prison term of 15 years to life for the murder conviction, together with a consecutive term of 5 years for the prior conviction.

The murder victim was Jodi Lods (hereafter Jodi or the victim), with whom appellant had lived for nearly seven years before her death in May of 1989. Appellant and Jodi had two children together: Wade and Ashley, who were ages four and two and one-half years, respectively, at the time Jodi was killed.[2]

Appellant and Jodi had a tumultuous relationship during which, appellant admitted, he struck her on numerous occasions, inflicting physical injuries of varying seriousness. In November of 1988, Jodi complained hysterically by telephone from Point Arena to her mother that appellant had beaten and kicked her. The following day, Jodi left with the two children for Santa Rosa. When she arrived there, her mother observed that "[s]he had black and blue marks all over her." She was taken to the hospital for treatment of her head injuries. Appellant also mentioned to one of the victim's sisters in early May of 1989 that "he had been mad at Jodi on other occasions where he was mad enough to—that he could have killed her."

In December of 1988, Jodi and the children moved into a cabin at the "Northwood Cottages," located on Highway 116 near the town of Monte Rio. Appellant returned to California from Oregon in December of 1988, and therafter occupied the cabin with Jodi and the children.

On May 24, 1989, Jodi's mother, Joan Lods (hereafter Mrs. Lods) drove Jodi to the cabin, depositing her there at approximately 7 p.m. Jodi appeared

---

[1] All further statutory references are to the Penal Code unless othewise indicated.

[2] Ashley had "just turned four" by the time of appellant's trial in January of 1991.

"upset" and "emotional" during the drive home. Mrs. Lods observed that appellant was at the cabin when she left Jodi there. Later that evening, Jodi walked into Guerneville along Highway 116. She was seen in town that evening at the River Club, a bar where she ordered beer, and the Safeway, where she purchased apple juice, milk and cereal.

The next morning, "a little after nine o'clock," Corinne Kaylor (hereafter Corinne), Jodi's sister, called the cabin to speak with Jodi. Appellant answered and said, "she is not here right now," but did not mention to Corinne "that he was so or . . . concerned about Jodi's whereabouts . . . ."

Appellant reported to the Sonoma County Sheriff's Department that Jodi was missing at 10:16 that morning. About 11 a.m., appellant informed Mrs. Lods by telephone that Jodi had gone to the Safeway the night before to buy milk and juice, but had not yet returned.

Mrs. Lods went to the social services department, where she knew Jodi had an appointment that day. Jodi did not show up there, so Mrs. Lods returned home and eventually called appellant. He told Mrs. Lods in conversations that day and evening that Jodi had gone to the Safeway almost immediately after arriving home the night before. Appellant also advised Mrs. Lods that he had called the sheriff's department.

The following day, May 26, Jodi failed to appear at a scheduled appointment in court, whereupon Mrs. Lods visited the cabin with Corinne. Appellant and the two children were home. Ashley grabbed Corinne by the pants and brought her into the cabin. Appellant stated that he wanted to "check along the roadside" of Highway 116 to "see if he could find anything." Mrs. Lods suggested that they first drive into Guerneville to determine if anyone had seen Jodi. Corinne stayed at the cabin with the children.

Corinne testified that immediately after appellant and Mrs. Lods left, Ashley stood up and became "completely hysterical." She "was jumpy" and "just started rambling." Corinne had never seen Ashley that excited. Corinne testified: "She said that daddy and mommy had a big, big fight, and that daddy cut mommy with a knife, and she didn't like her daddy when he drank a lot of beer, and he cut mommy's feet off, she went on to say he cut mommy's shoes off. Mommy just laid there." Corinne tried to calm Ashley, but the child "remained excited." Ashley added that "daddy punched mommy in the nose and mommy fell on the floor." Ashley demanded that they proceed outside to the garbage dumpster, in which Corinne discovered "brand-new" women's underwear, gin bottles and beer cans. Ashley, still excited, led Corinne into the kitchen and opened a drawer containing kitchen

knives and a meat cleaver. Ashley remained in an excited state the rest of the day and did not want to eat. Corinne further testified that while she observed dirty dishes in the sink and food scattered about the kitchen, the rest of the cabin was "very clean."

Appellant and Mrs. Lods were unable to uncover any trace of Jodi in Guerneville. They posted missing person signs around town with a description of Jodi and the clothes she had been wearing the night she disappeared: black Levi's jeans, a charcoal grey sweatshirt, a white tank-top, and a pair of dangling silver earrings.

After they had been in Guerneville about two hours, appellant reiterated his interest in walking along the roadway back toward the cabin, with Mrs. Lods following along slowly in the car. Appellant walked only along the "river side" of the road. About half-way back to the cabin, Mrs. Lods lost sight of appellant. When he reappeared 10 or 15 minutes later, he was carrying Jodi's purse, which was covered with dried mud. Appellant had found the purse "in some green ground cover"; there was no mud in the area. Appellant appeared "angry" or "emotional"; he "punched a mailbox on the side of the road." They took the purse to the sheriff's department. From that location, Mrs. Lods called Corinne and learned of Ashley's disclosures.

It was agreed that Ashley and Wade would stay temporarily with Mrs. Lods. When Wade was placed in Mrs. Lods' car, he "jumped" away from appellant and seemed "frightened." The children stayed with Mrs. Lods for five or six days. While there, Ashley awoke "night after night screaming, mommy, mommy, mommy, mommy." When appellant arrived to retrieve the children, Wade screamed, "don't let me go, I don't want to go, I don't want to go."

On May 27, trackers for the Sonoma County Sheriff's Department discovered the victim's clothes on a river bank about 40 feet from Highway 116 and "less than a quarter of a mile" from the cabin. A criminalist testified that human blood stains of Jodi's blood type were found on the front shoulders, neck and upper back of the grey sweatshirt and tank-top; blood was also found on a bra. The pattern of the stains suggested that the victim's clothing had been pulled up over her head. No stains were found on the black denim pants.

Sheriff's deputies visited the cabin on May 26 with a "blood hound handler." The dog was "scented" on Jodi's hair curlers and led the officers to "woman's panties" located in the garbage dumpster and a red eyebrow pencil buried at the edge of a nearby cabin. One of the deputies observed stains

which appeared to be blood on the wall above the bed and next to a light switch near the front door. The stain above the bed could not be seen during a later visit, but the stain near the light switch was removed by the sheriff's department after appellant left the cabin—the stain tested positive for human blood, of a type unknown. After appellant moved out of the cabin on June 7, the owner of the cabin also observed "deep dark reddish blackish stains" on the carpet in the kitchen and near the front door which looked to him "like blood stains."

Jodi's body was discovered on June 24, 1989, in a heavily forested area near a small stream about 50 feet from a logging road, one-half mile south of Monte Rio and a mile and one-quarter from the cabin. Redwood logs and bark had been placed over the body to cover it up but had "been rolled back, exposing the skull and hand." Turkey vulture feathers were scattered around the area, "and it appeared that there had been some predation on the body." Portions of the victim's hair were found near a feather "around eight feet from the body," and "entwined" in the hair was a "triangular-shaped earring." A second earring was later found near the stream about 50 feet from the body.

The advanced state of decomposition of the body precluded identification of the cause of death. "[T]here were no soft tissues remaining" on the body. The lower jaw was fractured and the first cervical vertebra was missing. No other injuries to the bones were found; the hands and feet were attached to the body. The pathologist, although unable to assign a cause of death, testified: "It would be quite possible that an individual could be stabbed without ever touching any bony structures and could well die from that type of stab wound."

On June 27, 1989, without informing appellant of the prior discovery of Jodi's corpse, deputies took him to various locations ostensibly to search for the body. At the third arranged search site—where the body had actually been found earlier—the officers left appellant alone but under observation. He "walked into the redwood grove and stopped, stood still for a moment . . . about ten feet . . . from where the logs had been replaced, and then backed out of the redwood grove." Appellant and the officers then "regrouped down by the vehicle" before leaving the area and proceeding to the sheriff's department. According to a prearranged plan, after appellant and the deputies left the scene another officer contacted the patrol vehicle by radio to falsely claim that he had just found the item they had been looking for, and described a triangular-shaped metal earring. No mention was made of the location of the discovery. Appellant's reponse was "something along the lines that's Jodi." Appellant also asked: "Am I under arrest?" At the sheriff's

station, appellant made a telephone call to his mother during which he mentioned that the police had "found a body, sounds like Jodi's." Although he had not yet been told where the body was discovered, he also said: "I wasn't more than ten feet from it."

Larry Moore was the occupant of a cabin at the Northwood Cottages located within 10 or 15 feet of the one in which appellant and Jodi lived.[3] He testified that on May 25, 1989, at 1:05 a.m., he heard a "giant thud" emanating from the next door cabin. The sound was "very loud," like a "body hitting the wall"; Moore thought appellant and Jodi "were having a fight." About 1:45 a.m., he heard a "scraping" noise, so he peeked out his window. He saw appellant "carrying or dragging something off the porch down the stairs away from the cottage." He could not identify the "large object" he observed, but the sound was "like cardboard dragging against gravel . . . ." Appellant dragged the object "between his cottage and the next cottage, which was empty at that time." Moore momentarily lost sight of appellant, but then looked out his other window which faces the parking lot and saw a car "with the headlights on . . . ." The lights were shining in his direction, so Moore was unable to see into the car.

The prosecution also adduced the testimony of Cheryl Bland (hereafter Cheryl) who also lived at the Northwood Cottages and often socialized with appellant. Cheryl testified that she loaned appellant her car on numerous occasions. Her car was an older model Rambler which could be started with "any kind of key." Cheryl testified that if appellant needed to borrow her car, "all he had to do is ask." On the night of May 24, 1989, Cheryl participated in a poker game, returned home intoxicated after midnight, and went to sleep. She did not know if appellant borrowed her car that night. The next day, appellant told her that Jodi had left the night before and not yet returned. Cheryl thought Jodi "just got pissed off and left" because she and appellant were "constantly fighting."

Appellant testified in his own defense at trial. He admitted suffering a prior robbery conviction in Oregon. He also admitted that during his relationship with Jodi he struck her with his fist at least five times, which caused her suffering black eyes and other injuries. He had been mad enough to kill her "a few times." Appellant denied that he assaulted Jodi in any way on the night of May 24, however, or had any involvement in her disappearance. He

---

[3]When originally questioned by the police, Moore denied that he had heard or seen anything the night Jodi disappeared. He subsequently advised the police of his observations, explaining that he was quite ill and for that reason reluctant to become involved. He testified at the preliminary hearing but was too ill to testify at trial. His videotaped testimony was played at trial for the jury.

claimed that Jodi left that night for Guerneville before dinner and never returned. Appellant insisted that he did not have access to a vehicle in May of 1989.

Appellant contends that the trial court erred in admitting the testimony of Corinne in which she recounted the statements made by Ashley describing appellant's assault upon Jodi. Appellant maintains that Corinne's hearsay testimony does not fall within the spontaneous declaration exception. (Evid. Code, § 1240.) He also argues that admission of such evidence violated his Sixth Amendment right to confront witnesses.

■ To avoid violation of a defendant's confrontation rights in the admission of hearsay evidence, the prosecution must show the unavailability of the declarant,[4] and that the out-of-court statement bears adequate "indicia of reliability." (*Idaho* v. *Wright* (1990) 497 U.S. 805, 815 [111 L.Ed.2d 638, 652, 110 S.Ct. 3139]; *Ohio* v. *Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 608, 100 S.Ct. 2531].) "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (448 U.S. at p. 66 [65 L.Ed.2d at p. 608]; see also *People* v. *Gallego* (1990) 52 Cal.3d 115, 176 [276 Cal.Rptr. 679, 802 P.2d 169].) Thus, we focus our inquiry upon the admissibility of Ashley's out-of-court statements under the hearsay exception for spontaneous declarations.

Section 1240 of the Evidence Code (hereafter § 1240) provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." ■ " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstamce of the occurrence preceding it.' [Citations.]" (*People* v. *Poggi*

---

[4]Appellant concedes that Ashley was unavailable as a witness. The prosecution attempted to qualify Ashley as a witness, but was unable to do so because of the child's extreme fear, apparently induced by either witnessing the killing of her mother or a subsequent act of sexual abuse, or both. At trial, she was unable to "do anything . . . except cling to her psychologist and refuse to answer any questions."

(1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082]; see also *People* v. *Pearch* (1991) 229 Cal.App.3d 1282, 1289-1290 [280 Cal.Rptr. 584]; *People* v. *Brown* (1980) 110 Cal.App.3d 24, 37 [167 Cal.Rptr. 557].)

■ Whether a statement satisfies the requirements of the spontaneous declaration exception is "largely a question of fact" and is within the discretion of the trial court. (*People* v. *Poggi, supra,* 45 Cal.3d 306, 318-319; see also *People* v. *Forgason* (1979) 99 Cal.App.3d 356, 365 [160 Cal.Rptr. 263].) On appeal, the trial court's finding on this issue will not be disturbed unless those facts on which it relied are not supported by a preponderance of evidence. (*People* v. *Provencio* (1989) 210 Cal.App.3d 290, 302 [258 Cal.Rptr. 330]; *People* v. *Jones* (1984) 155 Cal.App.3d 653, 660 [202 Cal.Rptr. 289].)

Appellant insists that Ashley's statements to Corinne on May 26, 1989, uttered nearly two days after the event they purportedly described—the assault on Jodi by appellant—cannot be considered spontaneous or without reflection under section 1240. He claims that the level of psychological stress necessary to render a statement spontaneous cannot be maintained for a period of two days. (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1130 [200 Cal.Rptr. 789].)

■ The lapse of time between the described event and the statement, although a factor in determining spontaneity, is not determinative. " 'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of sponta- neity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*' " (*People* v. *Poggi, supra,* 45 Cal.3d 306, 319; quoting from *People* v. *Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541].)[5]
■ A "spontaneous" utterance within the meaning of section 1240 is one which is "undertaken without deliberation or reflection." (*People* v. *Farmer* (1989) 47 Cal.3d 888, 903 [254 Cal.Rptr. 508, 765 P.2d 940]; *People* v. *Pearch, supra,* 229 Cal.App.3d at p. 1290.) "[T]he basis for the circumstan- tial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief. [¶] The crucial element in determining whether a

---

[5]This pronouncement by our high court indicates to us disapproval of language in *In re Cheryl H., supra,* 153 Cal.App.3d 1098, 1130, a case relied upon by appellant, that the requirement in section 1240 of a statement made under the stress of excitement caused by the described event "has been construed to introduce a very tight time limitation on out-of-court declarations which [the] parties seek to qualify as 'spontaneous exclamations.' "

declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is thus not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant." (*People* v. *Farmer, supra,* at pp. 903-904.)

■ The record[6] shows quite convincingly that Ashley was in a mental state of extreme agitation and excitement when she told Corinne of appellant's assault upon Jodi. The startling event she had witnessed and described was undoubtedly monumentally stressful for a child of that age. The appreciable interval between the incident and the subject statements suggest that the child had some opportunity for deliberation; intervening events, however, notably the visit of Corrine and Mrs. Lods, convince us otherwise. It was the latter event which precipitated Ashley's outburst. Corrine testified that, immediately following appellant's departure from the cabin with Mrs. Lods, Ashley became hysterical and commenced her frantic description of the assault. Until then, Ashley, who had apparently been sequestered in the cabin with her brother and appellant, had had no trustworthy person in whom to confide. The appearance of Corinne and Mrs. Lods, followed by the discussion of Jodi's disappearance and the departure of appellant, was a triggering event, startling enough to provoke an immediate, unsolicited, emotional outpouring of previously withheld emotions and utterances. (*In re Damon H.* (1985) 165 Cal.App.3d 471, 476 [211 Cal.Rptr. 623].) Once appellant left the premises, nothing preceded or provoked Ashley's volunteered statements; only the obviously continuing influence of the prior assault, coupled with appellant's absence and the first secure opportunity for disclosure, accounts for her spontaneous, animated description of the incident. (*People* v. *Poggi, supra,* 45 Cal.3d 306, 319; *People* v. *Panky* (1978) 82 Cal.App.3d 772, 779-780 [147 Cal.Rptr. 341].)

We accordingly find no error in the trial court's conclusion that Ashley's statements to Corinne were spontaneous rather than the product of reflection. (*In re Damon H., supra,* 165 Cal.App.3d 471, 476; *People* v. *Panky, supra,* 82 Cal.App.3d 772, 780.) ■ We further conclude that the statements are surrounded by "indicia of reliability" which negate any violation of appellant's confrontation rights. The requirements of the confrontation provisions are satisfied by statements admitted under the firmly rooted hearsay exception for spontaneous declarations. (*People* v. *Sully* (1991) 53 Cal.3d 1195,

---

[6]Appellant's *in limine* motion to exclude the evidence of Ashley's statements was determined on the basis of Corinne's testimony at the preliminary hearing, which was essentially indistinguishable from her testimony at trial. The trial court found that Ashley's statements were reliable and uttered while "she was still under the stress of what had happened to her mother . . . ."

1229 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Gallego, supra,* 52 Cal.3d 115, 176; *People* v. *Farmer, supra,* 47 Cal.3d 888, 905; *In re Damon H., supra,* at p. 478; *People* v. *Jones, supra,* 155 Cal.App.3d 653, 664; *People* v. *Orduno* (1978) 80 Cal.App.3d 738, 748 [145 Cal.Rptr. 806].) Ashley's statements were also made under circumstances which indicate to us a guarantee of trustworthiness sufficient to overcome any confrontation clause objection by appellant.[7] Admission of Ashley's statements to Corinne offend neither section 1240 nor appellant's right to confront witnesses.

. . . . . . . . . . . . . . . . . . . . . . . . . . .*

The judgment is affirmed.

Strankman, P. J., and Dossee, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 15, 1992.

---

[7]We observe in this regard that Ashley's statements are partially corroborated by the testimony of Larry Moore.

*See footnote, *ante*, page 1225.