[No. H025395. Sixth Dist. June 21, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
ROZMIN SALIM PIRWANI, Defendant and Appellant.

772

**COUNSEL**

Brian A. Pori, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ross C. Moody and Jeffrey M. Bryant Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McADAMS, J.**—In this appeal, we consider the constitutionality of Evidence Code section 1380, which creates a hearsay exception for statements made by elderly or dependent adults to law enforcement officials, in the wake of the United States Supreme Court's recent landmark opinion in *Crawford v. Washington*.[1]

Defendant Rozmin Salim Pirwani was a caretaker for Susan Ebaugh, a dependent adult. Ebaugh came into a large sum of money in August 1999, which was gone by February 2001. Threatened with eviction from her care facility for nonpayment of rent, she disclosed that she had entrusted the management of her finances to defendant. Shortly thereafter, Ebaugh died. Defendant was convicted of stealing Ebaugh's money. (Pen. Code, §§ 368, subd. (e), 487, subd. (a).)

On appeal, defendant contends that her constitutional rights were violated at trial by the admission of two hearsay statements by Ebaugh: (1) a videotaped statement made by Ebaugh to police two days before she died, admitted into evidence pursuant to Evidence Code section 1380; and (2) a statement Ebaugh made to her social worker's supervisor the day after she spoke to the police for the first time, admitted as a spontaneous declaration pursuant to Evidence Code section 1240.

In *Crawford*, the United States Supreme Court decided that an out-of-court testimonial statement made by a witness to law enforcement officials is barred by the Sixth Amendment's confrontation clause—even if there has been a judicial determination that the statement bears particularized guarantees of trustworthiness—unless the defendant had a prior opportunity to cross-examine the witness and the witness is unavailable to testify at trial. Contravening *Crawford*, Evidence Code section 1380 makes admissible at trial testimonial statements to law enforcement officials by unavailable witnesses, *without* giving the accused an opportunity to cross-examine.

The Attorney General concedes that *Crawford* renders Evidence Code section 1380 unconstitutional and that Ebaugh's videotaped statement to police was therefore erroneously admitted. We agree. We also conclude that

---

[1] *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*).

Ebaugh's statement to her social worker's supervisor should not have been admitted as a spontaneous declaration. Because we find that the errors were not harmless, we reverse.

## FACTS

We summarize the facts presented at trial in the following order. We begin with the background facts, which were largely undisputed. We then summarize the financial transactions that gave rise to this case. Next, we describe the challenged hearsay statements admitted at trial. Finally, we summarize defendant's evidence.

### Background

In 1998, defendant was the assistant director of nursing at Casa Olga, which is a 100-bed, 24-hour, residential, intermediate-care facility for physically dependent adults in Palo Alto. Defendant was promoted to director of nursing in late 1999 or early 2000.

Ebaugh was a resident at Casa Olga from 1998 until her death on July 27, 2001, at age 40. She was placed there because she suffered from a number of physical problems, including morbid obesity, a compressed fractured disc, severe sleep apnea, and knee and ankle pain that compromised her ability to walk more than a few blocks. Her worsening physical condition had forced Ebaugh to move out of her own apartment, where she had lived independently with support from a satellite-assisted living program. Ebaugh also had a number of psychiatric diagnoses, including borderline personality and a bipolar mood disorder, but they were not the reason for her admission to Casa Olga.

Defendant and Ebaugh developed an unusually close staff/patient relationship. Ebaugh spent a great deal of time in defendant's office, going over bills. The two would give each other back and neck rubs. Defendant bought cigarettes, soda, and fruit for Ebaugh at Costco. She gave Ebaugh small gifts such as stuffed bears, stationery, and books. She drove Ebaugh to the bank and to restaurants. Defendant even took Ebaugh to her home on Thanksgiving. Ebaugh would tell people that defendant was a like a sister to her. Ebaugh, in turn, bought defendant and her daughter a computer, bought them tickets to the Nutcracker and to Disney on Ice, and invited them to restaurant meals.

### The Financial Transactions

In August 1999, Ebaugh received a lump sum payment of $90,050 for some earlier gambling winnings. She deposited the check in her Bank of

America checking account. Over the next several months, she made significant withdrawals by writing checks made out to "cash," including one for $10,300 and another for $15,000. In December 1999, she wrote a check to cash for $38,699, used it to open a California Federal Bank (Cal Fed) account, and closed the Bank of America account. In late December 1999, Ebaugh withdrew $30,000 from her Cal Fed account.

During approximately the same time period, from August 1999 to February 2001, deposits exceeding $121,000 were made to defendant's accounts, including more than $34,000 in cash deposits. Defendant's total income during that time period from all employment sources was just under $67,000. Her withdrawals and expenditures totaled over $111,000.

In 2000 and 2001, Ebaugh's share of the monthly rent at Casa Olga was less than $400 per month; the balance of the rent was paid by Medi-Cal.[2] Nevertheless, by the end of January 2001, Ebaugh was more than $2,000 in arrears on her rent, approximately seven months' worth. It was the office manager's practice to have the nursing director talk to those residents who were behind in their rent and help collect the monies owed. To that end, Casa Olga's office manager wrote a note in late November 2000 to defendant, who was the nursing director. In the note, she reported that Ebaugh had not been paying, and asked if she should give Ebaugh a 30-day eviction notice. The office manager recalled speaking directly to Ebaugh at the end of 2000 or the beginning of 2001. She said, "Susan, you're behind in your rent," and "we need to do something about this." Ebaugh replied, "I don't know why it's not being paid." In late January 2001, the office manager wrote defendant another note, saying "We have to do something ASAP."

*Facts Presented Through Ebaugh's Statement to Sandra Louth*

The trial court permitted Sandra Louth to testify as follows. Louth was the program coordinator at the Caminar Community Living Center (Caminar CLC), an organization that helps mentally ill people stay in the community and out of the hospital. Louth had known Ebaugh since she was 19 years old, when Ebaugh came to a halfway house where Louth then worked. Ebaugh and Louth had maintained a relationship over the years. During the 14 years that Louth was employed as a crisis center counselor, she "saw Susan a number[] of times. . . . [¶] Sometimes she would just come back to attend groups. You're working with somebody who is really vulnerable and you build a relationship with them and they trust you. So she would come to get support

---

[2] Casa Olga's office manager testified that a person had to have income below a certain level to be eligible for a Medi-Cal subsidy at Casa Olga. If the resident suddenly came into more money than was allowed, he would no longer be eligible for the subsidy until he spent that money down to below the allowable level of income.

when things happened in her life. Her fiancé was hit by a bus and killed so she would come for support from the people she knew and trusted." Ebaugh continued to be a Caminar CLC client when she moved into Casa Olga, and Louth was her case worker's supervisor.

Louth testified that Ebaugh telephoned her on February 1, 2001. Ebaugh told Louth on the telephone that "she was very, very upset . . . something very serious had happened and she needed to speak to me in person." Ebaugh said it was not a life-or-death situation, so Louth went to see Ebaugh at her · next available appointment time, two days later.[3] Ebaugh was bewildered, confused, distraught and tearful, but not hysterical. She was emotional and "looking like someone who had received a shock." Ebaugh said Casa Olga staff told her that she was about to be evicted for not paying her share of the rent in eight months. She said she had done "a very, very stupid thing." She said she had "received an offer from the Nevada Gambling Council to cash out her winnings from a nickel jackpot slot." At the time, she had been considering weight loss surgery. Defendant had discouraged her from doing that because of the health risks involved, but Ebaugh nevertheless cashed out her winnings in July of 1999. Ebaugh said she had given her cashed-out winnings over to the care of the nursing director at Casa Olga, who told Ebaugh she would manage the money for her, pay her bills for her, and make sure she had the money for a long time. Defendant had asked Ebaugh for a $10,000 loan, and Ebaugh had given it to her. Over the next few months, she had given defendant $15,000 and $30,000. She said that, in all, she had entrusted about $55,000 in cash to defendant. In addition, Ebaugh said, she had purchased a computer and hired defendant's brother to give her 10 computer lessons for $5,000, but she had gotten only five lessons. She also said she had bought defendant's daughter a laptop computer for her birthday.

*Facts Presented Through Ebaugh's Videotaped Statement*

On July 25, 2001, Ebaugh gave a videotaped interview to Detective Jeff Mock of the Palo Alto Police Department. Also present were Brian Bagley, Casa Olga's ombudsman, Alexandria Thomas, a Caminar CLC case manager, and Mike Schumacher, an investigator from the Medi-Cal Fraud and Elder Abuse Bureau of the Department of Justice.

Ebaugh related that she had some winnings from Reno, which paid her $11,300 on a yearly basis. Medi-Cal paid for all her medications, except

---

[3] At the preliminary hearing, although not at trial, evidence was presented that Louth and Ebaugh went to the Palo Alto police station to make a report on February 1, 2001. That was the same day that Louth and Ebaugh first spoke on the telephone, according to Louth's trial testimony.

when she got her $11,000-plus payment in February. Then she would be billed for her medication until she spent her money down to $2,000 and could reapply for Medi-Cal.

At some point, Ebaugh applied for a program that permitted her to take all her winnings in one lump sum. After she received the $90,000-plus lump sum payment, she did not reapply for Medi-Cal. She did not think Medi-Cal ever knew about the lump sum payment.

Ebaugh originally intended to use $30,000 of the money to have liposuction surgery for weight loss. But defendant told her she did not need the surgery because it was not going to help. Defendant also told Ebaugh: "I can take care of this money for you. . . . This way you would always have money whenever you need it, and . . . you don't have to worry about . . . SSI hassling you . . . I can keep it in my account."

Defendant then asked Ebaugh to lend her $10,000 to pay off some bills; she said she would pay Ebaugh back at the rate of $250 to $300 a month. Ebaugh agreed to lend defendant the money. About this time, defendant began taking Ebaugh out for meals and buying her gifts. She also invited Ebaugh to her house for dinner. At the same time, defendant was pressuring Ebaugh for money.

Ebaugh finally went to the bank and withdrew $10,000, which she gave to defendant in cash. Defendant told her to write "child education donation" in the checkbook register so that no one would know. Ebaugh complied, though it was a lie. After that, defendant told Ebaugh she needed to "clear out [her] account." Ebaugh took out $10,000 on two occasions and $5,000 once. Because the bank would not let Ebaugh take the whole amount out at one time, defendant suggested moving Ebaugh's account to Cal Fed, where she had her own account. Cal Fed, however, would not cooperate. The bank employee asked Ebaugh in front of defendant "if I was being pressured to have this money taken out and I said, 'No,' because [defendant] was sitting there and at the time, I believed [defendant], I fell for it." Ebaugh made a withdrawal of $33,000 which she gave to defendant.

Defendant was supposed to be paying Ebaugh's rent and she was unaware that defendant was not doing so. Ebaugh did not know where the money was going, but she began to receive notices that her checks were bouncing. Ebaugh could not understand how she could be short of money if defendant was paying back the money she borrowed. Defendant told her not to worry, saying: "You have plenty of money right now."

Ebaugh was not getting her mail either. Defendant told the mail handler to send back any packages of merchandise Ebaugh ordered. Ebaugh first

realized she was being "scammed" when defendant asked her to lie to the office manager, because Ebaugh owed six months worth of rent and "there was a threat of me being kicked out." Defendant asked her to lie and say she had spent the money, but Ebaugh "wasn't about to do that." At this point, Ebaugh realized she was in trouble. Her roommate advised her to contact her case manager. Ebaugh did, and "Sandy [Louth] was in—there like within a half an hour." Sandy brought her to Detective Mock.

During the videotaped interview, Ebaugh reviewed checkbook registers, which had been in the accordion file defendant voluntarily gave to police in February 2001. Ebaugh admitted that many of the entries in the check register were in her own handwriting and reflected withdrawals for purchases for her own use. These included a check for $1,500 to the Casa Olga trust account that Ebaugh drew on for spending money; another check for $1,000 which she spent at Walmart; another check for $6,000 which she spent on clothing, magazines and other things she wanted; a check for $1,825, for a purpose she had forgotten; and a check for $4,000 which she spent on a television and a boom box. Other entries were not in her handwriting and recorded transactions of which she was not aware. For example, she did not recall ever withdrawing $15,000, and she exclaimed, "Oh, my God," when she saw an entry for that amount for the first time. She also did not recognize an entry for a $2,500 withdrawal, remarking that it was "not my handwriting and I'm getting mad. Oh, my God." Upon seeing another entry for a $1,000 check in handwriting other than hers, she said: "This is really . . . disturbing to me."

During the interview, Ebaugh also reviewed Costco and Visa credit card receipts, as well as an application for the credit card. Ebaugh said it was not her signature on the application. She had never seen the receipts before, either. These, she said, were "really a shock to me." She admitted some of the items paid for were for her use, but others were not.

*Defendant's Evidence*

Defendant testified she first learned that Ebaugh had come into money when the previous nursing director mentioned that Ebaugh would have to pay the full rent of $3,000 to $4,000 a month with private funds because she probably would not qualify for the Medi-Cal subsidy. Later, Ebaugh herself told defendant she had a large sum of money, and asked defendant for help keeping track of it and organizing her papers.

With respect to specific transactions, defendant admitted that she made all of the entries in two of Ebaugh's checkbook registers after the $38,000 deposit was made in the Cal Fed account, but she testified that all of the expenditures were for Ebaugh's benefit. Defendant did not know anything

about a check for $10,300 written by Ebaugh for a "[c]hild education donation." Ebaugh asked her to write check number 2133 for $15,000. Defendant was with Ebaugh when Ebaugh withdrew $30,000 from the bank because she feared "Y2K" problems. Ebaugh put the money in her own purse; defendant never saw the money after that. Defendant never asked to borrow $10,000 from Ebaugh, and did not recall ever talking to Ebaugh about borrowing money and paying it back at $200 or $300 a month. Defendant did apply for a credit card on Ebaugh's behalf, signing Ebaugh's name to the application and using the card to buy gas, but never without Ebaugh's permission. Even when she was most involved in helping Ebaugh keep track of her money, defendant never had responsibility for paying her rent.

Concerning the deposits to her own accounts, defendant testified that they represented income from two jobs plus large sums of cash that she received from and managed for her brother. Her brother's testimony confirmed that he had a large income but no checking account and therefore gave his money to defendant to manage for him.

On February 2, 2001, defendant went on her own to the Palo Alto Police Department with an accordion file full of documents relating to her financial dealings with Ebaugh. She denied converting any of Ebaugh's money to her own use.

Ebaugh was still a resident of Casa Olga and defendant an employee there when Ebaugh died on July 27, 2001.

## PROCEDURAL HISTORY

Several months after Ebaugh's videotaped statement and subsequent death, defendant was charged with theft or embezzlement of more than $400 by a caretaker from a dependent adult. (Pen. Code, § 368, subd. (e).) She was also charged with grand theft. (*Id.*, § 487, subd. (a).)

At defendant's jury trial the court admitted, over defendant's objections, both the videotaped statement Ebaugh had made to police and the statement Ebaugh had made to Sandra Louth.

Defendant was convicted of both charges. She was sentenced to prison for two years and was ordered to pay $55,000 to the victim restitution fund.

## APPELLATE CONTENTIONS

Defendant makes two contentions of error on appeal, both arising from the court's decision to admit Ebaugh's statements at trial.

Defendant first challenges the introduction at trial of Ebaugh's videotaped statement to police, asserting that its admission violates the Sixth Amendment's confrontation clause. Defendant also attacks the statement on other grounds.[4] At oral argument, we asked the parties to address the constitutionality of Evidence Code section 1380 in light of *Crawford*.[5] Responding to our request, defendant asserts that the statute is unconstitutional, both on its face and as applied in her case, because it allows for the admission of testimonial statements made to police officers by an unavailable witness who has not been cross-examined. The Attorney General agrees, but he argues that introduction of the statement at defendant's trial is harmless error.

Defendant next contends the court abused its discretion in admitting Ebaugh's initial statement to Louth; she further asserts that the error violated her constitutional confrontation rights.

### DISCUSSION

We find merit in defendant's contentions.

We begin by explaining our conclusion that Evidence Code section 1380 is unconstitutional and that Ebaugh's videotaped statement to police therefore should have been excluded. We then discuss our determination that the trial court erred in admitting Ebaugh's hearsay statement to Louth. Finally, we consider whether the errors in admitting the two statements prejudiced defendant.

### I. *Admission of the Videotaped Statement*

To provide the proper framework for our discussion of this issue, we first explain the historic understanding of the Sixth Amendment's confrontation clause, as explained by the United States Supreme Court in *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531]. We then describe the statutory hearsay exception at issue here. Next, we explain the transformation in Sixth Amendment jurisprudence that *Crawford* effected. Finally, we analyze *Crawford's* application here.

---

[4] Defendant's other grounds include her claim that admission of the videotaped statement violated both her Sixth Amendment right to be present and represented by counsel at the videotaping of Ebaugh's statement and her due process right to a fair trial. Defendant further challenges the videotaped statement on the ground that Ebaugh was not competent as a witness when she gave it. In light of our conclusion that *Crawford* renders Evidence Code section 1380 unconstitutional and that Ebaugh's videotaped statement should have been excluded, we need not and do not address defendant's other claims with respect to that statement.

[5] Because *Crawford* announced "a new rule for the conduct of criminal prosecutions," it applies "retroactively to all cases, state or federal, pending on direct review or not yet final. . . ." (*Griffith v. Kentucky* (1987) 479 U.S. 314, 328 [93 L.Ed.2d 649, 107 S.Ct. 708].)

## A. *The Confrontation Clause Under Ohio v. Roberts*

The Sixth Amendment's confrontation clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

In *Ohio v. Roberts,* the United States Supreme Court observed: "If one were to read this language literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial. . . . But, if thus applied, the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." (*Ohio v. Roberts, supra,* 448 U.S. at p. 63.) The *Roberts* court declined to read the constitutional language so broadly. Instead, the court ruled, a hearsay statement satisfies the Sixth Amendment's confrontation clause, despite a lack of face-to-face confrontation and cross-examination, so long as (1) the declarant is unavailable and (2) the hearsay statement "bears adequate 'indicia of reliability.' " (448 U.S. at p. 66.) "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Ibid.*)

This framework governed the interplay between hearsay and the confrontation clause until *Crawford.* (See, e.g., *Idaho v. Wright* (1990) 497 U.S. 805 [111 L.Ed.2d 638, 110 S.Ct. 3139], *White v. Illinois* (1992) 502 U.S. 346 [116 L.Ed.2d 848, 112 S.Ct. 736]; *Lilly v. Virginia* (1999) 527 U.S. 116 [144 L.Ed.2d 117, 119 S.Ct. 1887].) It required courts to independently identify and evaluate the myriad factors that bear upon a hearsay statement's reliability.

## B. *Evidence Code section 1380*

Ebaugh's videotaped statement was admitted at trial pursuant to Evidence Code section 1380.[6]

---

[6] Evidence Code section 1380 provides in relevant part as follows: "(a) In a criminal proceeding charging a violation, or attempted violation, of Section 368 of the Penal Code, evidence of a statement made by a declarant is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness, as defined in subdivisions (a) and (b) of Section 240, and all of the following are true: [¶] (1) The party offering the statement has made a showing of particularized guarantees of trustworthiness regarding the statement, the statement was made under circumstances which indicate its trustworthiness, and the statement was not the result of promise, inducement, threat, or coercion. In making its determination, the court may consider only the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. [¶] (2) There is no evidence that the unavailability of the declarant was caused by, aided by, solicited by, or procured on behalf of, the party who is offering the statement. [¶] (3) The entire statement has been memorialized in a videotape

Under Evidence Code section 1380, any videotaped hearsay statement made by an unavailable dependent adult to a law enforcement official is admissible in a criminal prosecution under Penal Code section 368. As the Attorney General correctly notes, this statutory hearsay exception is one of several enacted by the states to address "the special problems inherent in elder and dependent [adult] abuse cases."[7]

In an attempt to ensure its constitutionality, the Legislature specifically incorporated the *Roberts* framework into the statute. Thus, admissibility depends on a judicial determination that the statement bears "particularized guarantees of trustworthiness," that it was made "under circumstances which indicate its trustworthiness," and that it was not "the result of promise, inducement, threat, or coercion." (Evid. Code, § 1380, subd. (a)(1).) Furthermore, in "making its determination, the court may consider only the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." (*Ibid.*; see also *Idaho v. Wright, supra,* 497 U.S. at p. 819.)

As we now explain, however, *Crawford* renders the Legislature's attempt to satisfy *Ohio v. Roberts* superfluous.

---

recording made by a law enforcement official, prior to the death or disabling of the declarant. [¶] (4) The statement was made by the victim of the alleged violation. [¶] (5) The statement is supported by corroborative evidence. [¶] (6) The victim of the alleged violation is an individual who meets both of the following requirements: [¶] (A) Was 65 years of age or older or was a dependent adult when the alleged violation or attempted violation occurred. [¶] (B) At the time of any criminal proceeding, including, but not limited to, a preliminary hearing or trial, regarding the alleged violation or attempted violation, is either deceased or suffers from the infirmities of aging as manifested by advanced age or organic brain damage, or other physical, mental, or emotional dysfunction, to the extent that the ability of the person to provide adequately for the person's own care or protection is impaired."

Evidence Code section 1380 was enacted by the Legislature in 1999. (Stats. 1999, ch. 383, § 1.)

[7] Florida, Delaware, Oregon and Illinois have enacted similar hearsay exception statutes. (See e.g., Fla. Stat. Ann. § 90.803(24); Del. Code Ann. tit. 11, § 3516; Or. Rev. Stat. § 40.460, subd. (18a)(b); 725 Ill. Comp. Stat. Ann. 5/115-10.3. See also Pen. Code, § 368, subd. (a) ["The Legislature finds and declares that crimes against elders and dependant adults are deserving of special consideration and protection, not unlike the special protections provided from minor children, because elders and dependent adults may be confused, on various medications, mentally or physically impaired, or incompetent, and therefore less able to protect themselves, to understand or report criminal conduct, or to testify in court proceedings on their own behalf"].)

Florida's statute was found unconstitutional on confrontation clause grounds before *Crawford* was decided. (See *Conner v. State* (Fla. 1999) 748 So.2d 950, cert. den. *sub. nom. Florida v. Conner* (2000) 530 U.S. 1262 [147 L.Ed.2d 984, 120 S.Ct. 2719].)

## C. *The Confrontation Clause Under Crawford*

We begin our discussion of *Crawford* by summarizing its factual and procedural context. (See *Crawford, supra,* 541 U.S. at pp. 38–41 [124 S.Ct. at pp. 1357–1358].) There, the defendant was charged with assault but claimed self-defense. The police interrogated both the defendant and his wife, Sylvia. Sylvia's tape-recorded statement subtly undermined her husband's defense. At trial, Sylvia did not testify because the defendant invoked the state marital privilege. (*Crawford, supra,* 541 U.S. at p. 40 [124 S.Ct. at pp. 1358–1359 & fn. 1].) The prosecution then offered her taped statement to police as a statement against her penal interest. The defendant objected on confrontation clause grounds, but the Washington State trial court found the statements trustworthy and admissible under *Ohio v. Roberts.* On appeal, the intermediate appellate court reversed, citing various factors that, in its view, rendered Sylvia's statement unreliable under *Ohio v. Roberts.* The Washington Supreme Court overturned the Washington Court of Appeals, finding that Sylvia's statement did not fall under a "firmly rooted" hearsay exception, but it was nonetheless reliable under *Roberts* because it "interlocked" with the defendant's statement. (*Crawford, supra,* 541 U.S. at p. 41 [124 S.Ct. at pp. 1358–1359].) The United States Supreme Court "granted certiorari to determine whether the State's use of Sylvia's statement violated the Confrontation Clause." (*Id.* at p. 42 [124 S.Ct. at p. 1359].)

After examining the historical origins of the clause, the nation's high court repudiated the *Ohio v. Roberts* framework of "open-ended balancing tests" in favor of a "categorical" rule that requires "unavailability and a prior opportunity for cross-examination" with respect to "core testimonial statements that the Confrontation Clause plainly meant to exclude." (*Crawford, supra,* 541 U.S. at p. 63 [124 S.Ct. at pp. 1371, 1373, 1374].)

The *Crawford* court declined to "spell out a comprehensive definition of 'testimonial.'" (*Crawford, supra,* 541 U.S. at p. 68 [124 S.Ct. at p. 1374].) But it did not leave lower courts totally without guidance. As the high court explained, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused. It was these practices that . . . English law's assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind. [¶] . . . [¶] This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern

hearsay rules, but the Framers certainly would not have condoned them. [¶] The text of the Confrontation Clause reflects this focus. It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . . [¶] . . . Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing. [¶] Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. . . . [¶] . . . [¶] In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class." (*Id.* at pp. 50–53 [124 S.Ct. at pp. 1363–1365].)

As the court further explained, it used "the term 'interrogation' in its colloquial, rather than any technical legal, sense. Cf. *Rhode Island v. Innis*, 446 U.S. 291, 300–301 [64 L.Ed.2d 297, 100 S.Ct. 1682] [parallel cits. omit.] (1980). Just as various definitions of 'testimonial' exist, one can imagine various definitions of 'interrogation,' and we need not select among them in this case. Sylvia's recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." (*Crawford, supra*, 541 U.S. at p. 53, fn. 4 [124 S.Ct. at p. 1365, fn. 4].)

The *Crawford* court concluded: "Whatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Crawford, supra*, 541 U.S. at p. 68 [124 S.Ct. at p.1374].)

With these principles in mind, we now consider whether Evidence Code section 1380 survives *Crawford*.

D.  *Crawford Applied*

1.  *Application of Crawford to the Statute*

As we have seen, Evidence Code section 1380 itself incorporates the *Roberts* framework by requiring "a showing of particularized guarantees of trustworthiness regarding the statement." (Evid. Code, § 1380, subd. (a)(1).)

That standard is no longer good enough, where testimonial statements are at issue.[8]

■ With respect to the declarant, *Crawford* requires both unavailability and an opportunity for cross-examination. The statute fails in this regard. It requires the declarant's unavailability. (Evid. Code, § 1380, subd. (a).) But it does not envision or provide for the opportunity to cross-examine. As for the nature of the statement, *Crawford* governs testimonial statements and defines "[s]tatements taken by police officers in the course of interrogations" as "testimonial under even a narrow standard." (*Crawford, supra,* 541 U.S. at p. 52 [124 S.Ct. at p. 1364].) Evidence Code section 1380 requires that the statement be "memorialized in a videotape recording *made by a law enforcement official.*" (*Id.,* subd. (a)(3); italics added.) We cannot conceive of a situation in which a statement given to law enforcement officers under Evidence Code section 1380 would be other than "testimonial" within the meaning of *Crawford.*

For these reasons, we accept the Attorney General's concession that Evidence Code section 1380 is unconstitutional on its face under *Crawford's* confrontation clause analysis.

### 2. *Application of Crawford to this Case*

We now turn to Ebaugh's videotaped statement to Detective Jeffrey Mock of the Palo Alto Police Department and Department of Justice investigator Mike Schumacher of the Medi-Cal Fraud and Elder Abuse Bureau.

■ We note, first and foremost, that there was no opportunity for defendant to cross-examine Ebaugh. We next observe that Ebaugh's statement was an ex-parte, unsworn statement given to law enforcement agents. Even assuming that the statement was not taken specifically with a view towards its use at a later trial, it would be reasonable to anticipate its use at trial if Ebaugh became unavailable to testify. Like Sylvia's statement to the police in *Crawford,* Ebaugh's statement was "knowingly given in response to structured police questioning," and it "qualifies under any conceivable definition" as an inadmissible testimonial statement to law enforcement officials under *Crawford.* (*Crawford, supra,* 541 U.S. at p. 53, fn. 4 [124 S.Ct. at p. 1365, fn. 4].)

As the Attorney General correctly observes: "Whatever the limits of *Crawford's* characterization of 'testimonial' hearsay, a formalized statement,

---

[8] We express no opinion on the question whether *Crawford* undermines the *Roberts* balancing test where nontestimonial statements are concerned. (See *Crawford, supra,* 541 U.S. at p. 68 [124 S.Ct. at p. 1374] ["Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether"].)

such as the instant videotape, wherein there is an inquisitorial interaction between a law enforcement official and the victim relating to the facts at issue at trial, appears to clearly fit within the scope of 'testimonial' hearsay which *Crawford* holds is subject to the Confrontation Clause."

Under *Crawford*, then, Ebaugh's videotaped statement was inadmissible at defendant's trial.

## II. *Admission of Ebaugh's Verbal Statement to Louth*

We next consider defendant's second contention on appeal, her challenge to Ebaugh's statement to Sandra Louth.

Ebaugh made the challenged statement two days after tearfully calling Louth to say that "something very serious had happened" and that she needed to speak with her, but one day after she spoke to police for the first time. Defendant claims the statement should have been excluded, because it did not qualify for admission under the hearsay exceptions for state of mind or spontaneous declaration. (Evid. Code, §§ 1250, 1240.) The prosecutor offered the statement only as a spontaneous declaration and, as we read the record, the trial court ruled it was admissible on that basis. (*Id.*, § 1240.)

As we explain, we conclude that the trial court erred in admitting the statement as a spontaneous declaration. To provide the proper framework for our discussion, we begin by setting forth the standard of review. We then summarize the applicable statutory hearsay exception. Against that backdrop, we describe the factual context in which the challenged statement was made. Finally, we apply the governing legal principles to those facts.

### A. *Standard of Review*

■ We apply the abuse of discretion standard in reviewing the trial court's determination to admit or exclude hearsay evidence. That standard applies to questions about the existence of the elements necessary to satisfy the hearsay exception. (*People v. Poggi* (1988) 45 Cal.3d 306, 318–319 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People v. Martinez* (2000) 22 Cal.4th 106, 120 [91 Cal.Rptr.2d 687, 990 P.2d 563].)

### B. *Hearsay Exception for Spontaneous Declaration*

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused

by such perception." (Evid. Code, § 1240.) " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been made before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.] [¶] 'The foundation for this exception is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury. [Citation.] [¶] The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' [Citation.] [¶] Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.] In performing this task, the court 'necessarily [exercises] some element of discretion. . . .' [Citation.] [¶] Because the second requirement relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met [citation]." (*People v. Poggi, supra*, 45 Cal.3d 306, 318–319.)

### C. *Factual Background*

At trial, Sandra Louth testified that Ebaugh called her on February 1, 2001, to say she urgently needed to speak with her. Louth testified she was unable to meet with Ebaugh that day, but she scheduled an appointment to speak with her two days later, on February 3d. At that time, Ebaugh told Louth about defendant's involvement in her financial affairs, and she accused defendant of stealing $55,000 from her.

Defense counsel objected to Sandra Louth's testimony on hearsay grounds, arguing that Ebaugh's statement did not qualify as an excited utterance, since it was made "the day after she'd been to the police and told the police everything." The factual basis for counsel's objection was corroborated by transcripts of the preliminary hearing and of Ebaugh's videotaped statement, both of which the trial court had read. The trial court nevertheless admitted the statement, subject to a motion to strike, saying "this lady's . . . got mental problems. She's concerned about her feelings with others, about how she's seen by other people and money being gone. I could suspect she could be under stress of making a statement like for at least a short period of time."

The trial court evidently had some misgivings about admitting Louth's testimony. At one point the court interrupted Louth's testimony to tell the attorneys: "Excited utterances, there's a lack of appreciable time for reflection and contemplation. I can see making a call to her the next day after being told she was going to be evicted, but anything made after that would probably be hearsay." Defense counsel reiterated that "the intervening day in which she went to the police and gave a clear report allows time for reflection and input from other people about her situation. It's not at all excited anything." Saying that it had that "in mind," the court nevertheless allowed in evidence Louth's narrative of Ebaugh's statement to her. She went on to testify that when they talked Ebaugh "was tearful" but "not sobbing. . . . She was calm . . . not hysterical. . . . She had tears in her eyes. And she was looking at me and looking very confused [asking] how she could have done this to me? And looking like someone who had received a shock."

### D. *Analysis*

As we now explain, the trial court exceeded the bounds of its broad discretion when it admitted Ebaugh's statements to Louth as spontaneous declarations. At the time she first telephoned Louth, Ebaugh was tearful and evidently quite shaken by the news that she was about to be evicted from Casa Olga. But two days elapsed before the substantive discussion between the two women. By itself, this fact does not disqualify the statement from consideration as an excited utterance.

"The lapse of time between the described event and the statement, although a factor in determining spontaneity, is not determinative. ' "Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*" ' [Citation.]" (*People v. Trimble* (1992) 5 Cal.App.4th 1225, 1234–1235 [7 Cal.Rptr.2d 450], some italics omitted.)

As noted above, however, the utterance must be spontaneous. (*People v. Poggi, supra,* 45 Cal.3d 306, 318–319.) It must be "made without deliberation or reflection. [Citation.] 'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker. . . .' [Citation.]" (*People v. Raley* (1992) 2 Cal.4th 870, 892–893 [8 Cal.Rptr.2d 678, 830 P.2d 712].)

In this case, the circumstances surrounding this statement show ample opportunity for deliberation and reflection. Both the preliminary hearing transcript and the videotaped statement indicate that Louth accompanied

Ebaugh to the police station on February 1, 2001. According to Louth's testimony, that was the same day Ebaugh made her initial phone call to Louth. Given the two-day lapse between Ebaugh's initial telephone call to Louth and the hearsay statement—a period that apparently was punctuated by a visit to the police station—Ebaugh patently had the chance to return to a calmer mental state. This case is thus unlike *Trimble.* There, the two-and-one-half-year-old declarant witnessed the defendant stabbing her mother, then she was sequestered for almost two days alone with the defendant and her four-year-old brother, with "no trustworthy person in whom to confide." (*People v. Trimble, supra,* 5 Cal.App.4th at p. 1235.) After a trusted adult arrived and the defendant left the house, talk turned to the mother's disappearance, and the child then "became hysterical and commenced her frantic description of the assault." (*Ibid.*) Here, by contrast, there was an adult declarant—albeit one with "mental problems"—who had two days in which to gather her thoughts, reflect on them, and regain her composure.

■    Under the circumstances, we believe the court abused its discretion in finding that Ebaugh spoke to Louth while "the reflective powers [were still] in abeyance." (*Showalter v. Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895].) It is true that Louth described Ebaugh's demeanor as bewildered, confused, distraught and tearful—though not hysterical—and as "looking like someone who had received a shock." Even so, in light of the fact that Ebaugh already had gone to the police to accuse defendant of stealing from her, and had talked to at least two police officers, we cannot agree that Ebaugh lacked *the opportunity* for reflection and deliberation before she spoke with Louth.

Under these circumstances, we are constrained to conclude the trial court erred in admitting the statement.

### III.   *Harmless Error and Cumulative Prejudice*

As the final step in our analysis, we consider whether the trial court's errors require reversal. The Attorney General argues that the error in admitting Ebaugh's videotaped statement at trial was harmless beyond a reasonable doubt, and even if Ebaugh's statement to Louth was erroneously admitted, it is not reasonably probable defendant would have obtained a more favorable result in the absence of that error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

In assessing whether the error in this case was harmless, we first consider *Crawford's* impact on the analysis. The United States Supreme Court remanded the *Crawford* case to the Washington Supreme Court for further proceedings; it also noted that the state appellate court had found the

confrontation violation "not harmless." (*Crawford, supra*, 541 U.S. at p. 42, fn. 1 [124 S.Ct. at pp. 1359, fn. 1, 1374]; see also *id.* at p. 75 [124 S.Ct. at p. 1378] (conc. & dis. opn. of Renquist, C. J.).) From this, we can only infer that while *Crawford* radically alters the way we analyze claims of error under the confrontation clause, it apparently does not change the way we evaluate the effect of any such error. We therefore consider whether the constitutional violation in this case is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

The Attorney General's fact-intensive harmless error analysis depends, in part, on the assumption that Louth's testimony, including—as he puts it— "both her recitation of Ebaugh's general complaints of theft, and her recitation of Ebaugh's specific complaints regarding specified large sums of money . . ." remains in the case. The Attorney General thus argues: "Although [defendant] denied any criminal activity, her story was contradicted by the documentary evidence *and Ebaugh's statement to [Louth].*" (Italics added.) As that argument reflects, Ebaugh's hearsay statement to Louth contributed to the evidence of defendant's guilt.

Similarly, the Attorney General's argument that admission of Ebaugh's statement to Louth is harmless error depends, in part, on the fact that it was "only a brief summary of the evidence already before the jury *through Ebaugh's videotaped statement.*" (Italics added.) In our view, without *any* evidence of Ebaugh's statements accusing defendant of theft, it is questionable whether the prosecution would have been able to prove beyond a reasonable doubt that the money withdrawn from Ebaugh's accounts was the same money defendant deposited in her account, or that the money, computers, meals, tickets, clothes and other items were not gifts from Ebaugh to defendant, or that Ebaugh did not simply squander a considerable amount of money over a short period of time.

Under these circumstances, we think the cumulative effect of the errors was prejudicial to defendant. Having previously determined that *both* statements by Ebaugh were erroneously admitted at trial, we now conclude that the errors were harmful, whether we apply the federal or state test of harmless error. (*Chapman v. California, supra,* 386 U.S. 18; *People v. Watson, supra,* 46 Cal.2d 818, 836.) Given the nature and significance of the evidence that was erroneously admitted, we cannot agree that the errors were harmless. The judgment of conviction thus must be reversed.

## CONCLUSION

Given that much of the evidence against defendant consisted of the victim's unsworn out-of-court statements, and after careful review of the

record and consideration of defendant's constitutional and statutory claims of error, we conclude that the trial court committed prejudicial error in admitting both of Ebaugh's hearsay statements.

## DISPOSITION

The judgment is reversed.

Rushing, P. J., and Premo, J., concurred.