Filed 4/10/24

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>NORMAN ALEXANDER LOZANO,<br><br>    Defendant and Appellant. | A165646<br><br>(Contra Costa County<br>Super. Ct. No. 5-200826-6) |

Norman Alexander Lozano appeals a judgment entered upon a jury verdict finding him guilty of multiple sexual offenses against two girls, Jane Doe 1 (Doe 1) and Jane Doe 2 (Doe 2).  His primary argument on appeal, from which all his other contentions flow, is that the trial court erred in admitting an out-of-court statement of Doe 1, who told her mother that defendant had been molesting her since she was 11 years old.

We agree with defendant that the trial court abused its discretion in admitting this evidence as a spontaneous statement.  (Evid. Code, § 1240 (section 1240).)  The 16-year-old girl who made this disclosure was stepping forward years after the abuse began, after carefully considering whether she wanted to disclose it.  Although she was understandably emotional, her

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Section II of the Factual and Procedural Background and Sections II through IV of the Discussion.

1

torment did not make the statement admissible under section 1240. We also conclude, however, that the admission of this statement was prejudicial as to only a single count of committing a lewd act on a child under the age of 14. (Pen. Code, § 288, subd. (a).) We therefore reverse the conviction on count 1, as well as resulting enhancements alleging defendant committed this offense against multiple victims, but otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

## I. Crimes Against Jane Doe 1

### *Doe 1's Statement to her Mother*

Doe 1 was born in July 2000, when defendant was 24 years old. By the time of trial, Doe 1 was deceased. The jury heard prior testimony of her mother, Shannon C.,[1] about a brief conversation between the two of them. Shannon was also deceased by the time this testimony was read to the jury.

On the morning of June 6, 2017, Shannon was outside the home of a friend and neighbor on Market Avenue in San Pablo. As she walked up a path, she saw Doe 1, her 16-year-old daughter, outside the neighbor's house. Doe 1 was crying, and she immediately told Shannon, " 'Mom, he's been molesting me.' " Doe 1 identified defendant, who was a family friend, as the molester, and said it had been going on since she was 11 years old. According to Shannon, it was uncommon for Doe 1 to be emotional in that manner.

Defendant's truck was outside the house, and Doe 1 said she had seen him about five minutes previously. Shannon immediately called the police. An officer spoke with Doe 1, and defendant, who was in the house on Market Avenue, was then arrested.

---

[1] In the interest of privacy, we will refer to some family members by their first names, intending no disrespect.

***Testimony of Doe 1's Brother***

Doe 1's brother, Miguel, testified that he recalled meeting defendant for the first time in late 2011, when defendant was dropping off Doe 1 at home late in the evening. Doe 1 was in about fifth grade at the time. In the ensuing years, defendant often came to Doe 1's family home, and the family socialized frequently with a group of friends that included defendant. These gatherings often took place at the home of the family friend on Market Avenue, and defendant drank heavily at them.

Miguel recalled that around the middle of 2012, when Doe 1 was 11 or 12, defendant and Doe 1 began going off together in the evening three or four times a week, saying they were going to the gym, or sometimes to defendant's lounge bar. By around April 2013, when Doe 1 was 12 years old, Miguel began noticing that she and defendant seemed more comfortable together, "almost like if it was something normal," spent more time together, and stayed out later. They sometimes did not return until "10:00, going on towards 11:00," and defendant dropped Doe 1 off around the corner rather than at the entrance to the family's apartment, a matter that Miguel found very unusual. During 2013, Miguel also noticed Doe 1 become secretive about where she and defendant went and what they were doing.

Around April of 2013, defendant began coming on his own to Doe 1's family's home, and he, Doe 1, and Shannon would listen to music and dance, while defendant and Shannon drank beer and spirits. On one occasion when Doe 1 was 13, it was around midnight, and Miguel was in his bedroom down a hallway at the back of the house. He heard Doe 1 and defendant speaking to each other in a utility closet between Miguel's and Doe 1's bedrooms. Doe 1 asked defendant if she could call him " 'babe,' " and defendant

responded she should "calm down" and "keep it quiet." Miguel testified that at that point his "suspicions were more or less confirmed."

The morning Doe 1 reported the molestation, Miguel went to the house on Market Avenue, and he testified she was "very, very emotional."

### Examination of Doe 1

A forensic nurse carried out a sexual assault examination on Doe 1 on the afternoon of the day she reported the molestation. Doe 1 was shaky during the entire examination. The nurse observed multiple abrasions to Doe 1's perineum, as well as several linear lacerations. The injuries had not yet begun to heal, which indicated they had been sustained no more than 48 hours previously. They were consistent with blunt force trauma that could have been caused by a finger or a penis, and they would have been painful. The nurse testified it was unusual to see such injuries, even after an alleged sexual assault, although they could have resulted from consensual sexual activity.

### Results of Investigation

Defendant rented an apartment on Garrity Way in Richmond from March 18 to June 6, 2017. Doe 1, who was 16 years old during this time, had a key to the apartment. A search of the apartment showed that only one bedroom was furnished, containing a bed with bedding, a nightstand, and a television stand. In the drawer of the nightstand were some bras and birth control pills in Doe 1's name. A condom was on the television stand. A torn piece of condom wrapper was found on the bed when the sheets were moved aside. There was women's clothing in the closet. In a second bedroom was a shoe box with shoes and a receipt for a purchase on a credit card that contained the same last four digits as a credit card in defendant's wallet. On the kitchen table was a prescription bottle in Doe 1's name.

4

A search of defendant's cell phone, which appeared to have been in use since November 16, 2016, showed more than 600 calls to or from Doe 1's phone number between that date and June 1, 2017. Seventeen of those calls occurred on Valentine's Day. There were also many text messages apparently exchanged between defendant and Doe 1. Some of the messages expressed his love and need for her, his hope to spend the night with her, plans to meet, and his plan to rent a place where he could be happy with her; others appeared to consist of arguments between the two. A text message exchange around 10:00 on the evening of Valentine's Day indicated defendant was going to " 'get the room.' " In an exchange in March 2017, the pair expressed their need for each other, and defendant told Doe 1, " 'you need the pill.' "

Among the photographs on defendant's cell phone were two full-body pictures of a person who appeared to be Doe 1, unclothed, one of her clad only in a bra, and one close-up that appeared to be of her uncovered vaginal area. At least one of the photographs appeared to have been taken in a hotel room while Doe 1 was either asleep or unconscious, and showed a box of condoms and alcohol on a nightstand.

Sheets and a blanket found on the bed in the apartment on Garrity Way had semen on them. The sample on the blanket was tested, and the DNA matched defendant's. The sample from the sheet was not tested.

A swab from Doe 1's left breast showed DNA that matched defendant's. A swab from defendant's genitals and fingertips produced DNA that matched Doe 1's.

### *Defendant's Admissions*

After his arrest, defendant initially denied any sexual contact with Doe 1, but eventually admitted to having engaged in multiple sexual acts with

5

her, both vaginal and oral.  He estimated she performed oral sex on him "[l]ess than 10" times, and he performed oral sex on her  "[m]aybe five" times. They first had sex "a year and something" previously, when Doe 1 was 15 years old "[a]nd months," or "15 almost 16."

## II.    Crimes Against Jane Doe 2

Doe 2 was born in August 1984. She met defendant in 1997, the summer she turned 13 years old.  Doe 2 and a friend were walking to Hilltop Mall in Richmond when defendant pulled up in his car and offered them a ride, which they accepted.  They exchanged telephone numbers before he dropped them off.  Two or three weeks later defendant called, and he took Doe 2 and her friend to buy wine coolers.  She next saw him two or three weeks after that, early in seventh grade, when she was late for school and called him for a ride to her middle school.  He told her he was 18 years old, although his actual age was 22.

The next time Doe 2 saw defendant, she went to his house through a back entrance during the evening, he gave her a sweet alcoholic drink, and they drank and watched television together.  She had more than one drink and felt "out of it."  He asked her if she wanted to have sex, and she refused. He then asked if he could perform oral sex on her, she agreed after he assured her it would not hurt, and he did so.  She was 13 years old at the time.

Two or three weeks later, defendant picked Doe 2 up and they went to a hotel, where he provided her with alcohol.  He had condoms with him, and they had sexual intercourse.  She was still in seventh grade.

Doe 2 and defendant continued to have a sexual relationship for six or seven years after that.  They would see each other at least once a month, and some of their meetings involved sexual encounters.  They had sexual

6

relations three or four times before she turned 14, and a total of around 30 times before she turned 18. Doe 2 considered defendant her boyfriend.

Doe 2's relationship with defendant ended when she was 19 or 20 years old. Someone identifying herself as defendant's wife called Doe 2 and told her to stay away from defendant. Doe 2 had not known defendant was married.

Doe 2 came forward and reported these events to the police in 2017, after defendant's arrest, when she saw a flyer with defendant's picture that asked anyone with information to call the police.

### III. Verdicts and Sentence

The jury found defendant guilty on all counts. As to Doe 1, he was found guilty of a lewd act upon a child under the age of 14 between July 2011 and July 2014 (Pen. Code, § 288, subd. (a); count 1);[2] one count of a lewd act upon a child aged 14 or 15 between July 2014 and July 2016 (§ 288, subd. (c)(1); count 4); two counts of oral copulation of a person under the age of 18 between July 2011 and the date Doe 1 made her report (former § 288a, subd. (b)(1); see § 287, subd. (b)(1); counts 2 and 3); and two counts of unlawful sexual intercourse during this same six-year period (§ 261.5, subd. (c); counts 5 and 6).

As to Doe 2, the jury found defendant guilty of three counts of committing a lewd act upon a child under the age of 14. (§ 288, subd. (a); counts 7, 8 and 9.)

For each of the counts for lewd acts against a child under the age of 14, the jury found true allegations that defendant had more than one victim. (§§ 667.61, subd. (j)(2), 1203.066, subd. (a)(7).) As to the counts against Doe 2, the jury also found true allegations that defendant had substantial sexual

---

[2] All undesignated references are to the Penal Code, except that "section 1240" refers to the Evidence Code.

contact (§ 1203.066, subd. (a)(8)) and that the statute of limitations had been extended (§ 803, subd. (f)(1)).

The jury also found true three factors in aggravation: that the victims were particularly vulnerable, that the crimes were carried out in a manner indicating planning, sophistication, or professionalism, and that defendant took advantage of a position of trust or confidence to commit the offenses.

The trial court sentenced defendant to a total term of 50 years to life plus a determinate term of five years and eight months in prison.

## DISCUSSION

## I. Admission of Doe 1's Statement to Shannon

### A. Additional Background

At the outset of trial, the People sought admission of two statements made by Doe 1 on June 6, 2017, the day she reported the crimes. The first was her statement to Shannon, outside the house on Market Avenue, about the molestation. Shannon testified that Doe 1 told her immediately upon seeing her, " 'Mom, he's been molesting me,' " and that as part of that first statement, Doe 1 said it had been going on since she was 11 years old.

The second was a more extensive statement Doe 1 made to a police officer who came to the scene after Shannon called. Doe 1 told the officer defendant had been molesting her since she was 11 or 12 years old, that she had lost her virginity to him, and that they had sex "[o]ver hundreds of times." She told her mother about the molestation because "it's bothered me so much and it doesn't even feel good and I had to tell my mom, 'cause I can't hold it in any more. It hurts."

Doe 1 told the officer that two days previously, "I literally sat on the side of my bed, and I said, 'What am I doing with this guy? He's like 20 years older than me,' " and she asked to talk to him. The next day—which was the

8

day before she told Shannon of the molestation—he took her to the apartment on Garrity Way and they had sex. When asked if that sexual encounter had been consensual, she replied, "he got in my head. Yeah," then said "I can't tell him no. He's, he hit me before, he's busted my lip. . . . We've gotten in fights." On this occasion, however, she told defendant she did not want to talk to him again, and said she would " 'call the cops' " if he did not let her speak to his wife. Doe 1 described herself as "coming to [her] senses," and she told defendant, " 'I'm not stupid anymore.' " It is not entirely clear from Doe 1's statement to the officer whether she said these things to defendant before or after this final act of sexual molestation.

The People argued that both Doe 1's initial statement to Shannon and the statement she then made to the responding officer were admissible as spontaneous statements under section 1240. The People pointed out that Doe 1 was "very emotional, crying throughout the interview," and argued that after years of abuse she reached "an emotional and psychological point where she '[could]n't hold it in anymore.' " And, the People contended, her statement to the officer was not testimonial because it was intended primarily to address defendant's presence in the house on Market Avenue and to extricate herself from the abuse.

The trial court excluded the statement to the reporting officer as testimonial, but concluded that Doe 1's unsolicited statement to Shannon, " 'He's been molesting me,' " was admissible as a spontaneous statement. (§ 1240.)

Defendant filed a motion for reconsideration. He argued that Doe 1's statements to the police officer immediately after she disclosed the molestation to Shannon showed Doe 1 had deliberated before making the report. He pointed to Doe 1's statement that two days previously she realized

9

she no longer wanted to be with defendant, so she alerted him they needed to talk and then told him, " 'I don't ever want to talk to you again,' " and " 'let me talk to your wife or I have to call the cops.' " Defendant also attached to his reply brief excerpts from another interview Doe 1 had with two police detectives later on the day of her initial report.

In her interview with the two detectives, Doe 1 explained how hard she had struggled with her decision to disclose defendant's abuse. She said she had "wanted to tell someone but I couldn't because I was embarrassed and . . . felt like mom would've judged me or something but, in the end I know she wouldn't. So [for the next two or three days] I just started thinking more and more about my life you know, and like what was I doing? What am I doing with this person? [¶] . . . [¶] And yeah, I just figured that today I had to tell my mom finally" because "I was going kinda crazy in my head about it." Doe 1 told the detectives of her anger with defendant for having lied to her, including about the fact that he and his wife had a baby. And she told them she had confronted defendant that morning with the fact she intended to disclose the abuse. Doe 1 said she told him "it's killing me inside, like I'm going crazy . . . I'm gonna have to tell my mom." He urged her not to tell because it would get him in trouble, but she responded, "you keep hurting me. And you keep lying to me like, why do I want to keep protecting someone like you, you know?" At this point, defendant "walked off cause I told him I was gonna call the police," and "then my mom came and I told her and she started crying. . . ."

The trial court denied defendant's motion to reconsider. It first remarked there had been no change in circumstances to justify reconsideration, but then went on to discuss the motion on its merits. As to Doe 1's statements in her interview with the two detectives—statements

defendant agreed were inadmissible at trial—the court concluded it would be inappropriate to consider inadmissible testimonial hearsay for purposes of ruling on the admissibility of Doe 1's statement to Shannon. The court also identified for the first time the event it credited with precipitating Doe 1's statement to Shannon, that after Doe 1 felt she "can't take it any more, he uses her again sexually." In the court's view, Doe 1's statement to Shannon was "completely out of the blue; that she might have thought about it before she blurted this out to her mother to me does not undermine the spontaneity of her statement to her mother while she's crying, while the person who's caused so much grief to her in her lifetime is right there at the house." Thus, the trial court, concluded, even if Doe 1 thought about the matter in advance, she acted spontaneously at the time she spoke with Shannon.

### B. Legal Principles

Under the exception to the hearsay rule for spontaneous statements, a trial court may admit evidence of a statement that "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant," if the statement "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." (§ 1240.) For a statement to be admissible under this exception, " '(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been made before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstances of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).)

"A spontaneous statement is one made without deliberation or reflection." (*People v. Raley* (1992) 2 Cal.4th 870, 892 (*Raley*).) The " 'crucial

11

element' " in determining whether a statement is sufficiently reliable to be admissible as a spontaneous statement is " 'the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant.' " (*Id*. at pp. 892–893.)

Whether the requirements of this exception are satisfied is "largely a question of fact" for the trial court to determine, a task in which it " 'necessarily [exercises] some element of discretion.' " (*Poggi*, *supra*, 45 Cal.3d at p. 318.)

But it is an abuse of discretion to admit a statement under this exception when "the circumstances surrounding [the] statement show ample opportunity for deliberation and reflection." (*People v. Pirwani* (2004) 119 Cal.App.4th 770, 789–790 (*Pirwani*).) Thus, a statement made when the victim of a crime was "bewildered, confused, distraught and tearful," but *after* she had gone to the police and " 'told [them] everything,' " was not properly admitted as a spontaneous statement. (*Id*. at pp. 788, 790.) And in *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1524–1525 (*Ramirez*), it was an abuse of discretion for the trial court to admit under section 1240 statements made by a rape victim several hours after the crime, when the content of her statements showed she had deliberated or reflected on what had occurred. Although she was upset and crying, the victim related the events of the previous evening in detail, expressed concern about what her brother might do if he found out about them, and asked someone to call several friends because she needed a ride. As the *Ramirez* court explained, both the narrative style and the content of the victim's statements indicated they were

not spontaneous for purposes of the hearsay exception. (*Id*. at pp. 1525–1526.)

The mere passage of time does not necessarily render a statement inadmissible under the exception for spontaneous statements. This principle is illustrated in *People v. Trimble* (1992) 5 Cal.App.4th 1225 (*Trimble*). There, the defendant was convicted of murdering his romantic partner. One of the couple's children, Ashley, was two-and-a-half years old at the time. (*Id*. at p. 1228.) Two days after the victim was last seen alive, the victim's sister went to the family home to stay with the children while the defendant purportedly went to search for the victim. When the defendant left, Ashley immediately stood up, became hysterical, and said her parents had had a " 'big, big fight, and that daddy cut mommy with a knife' " and " 'punched mommy in the nose and mommy fell on the floor.' " (*Id*. at p. 1229.) The mother was later found dead. (*Id*. at p. 1231.) The appellate court found no abuse of discretion in the admission of this statement, although it was made almost two days after the event it described. The evidence showed Ashley was extremely agitated when she made the statement, and she made it immediately after her father left the home, the first time since the incident there had been a trustworthy adult in whom she could confide. The appearance of the aunt, followed by a discussion of the victim's disappearance and then the defendant's departure, "was a triggering event, startling enough to provoke an immediate, unsolicited, emotional outpouring of previously withheld emotions and utterances." (*Id*. at p. 1235.)

Other cases have likewise upheld application of the exception for spontaneous statements even after some time has passed. (See, e.g., *People v. Brown* (2003) 31 Cal.4th 518, 541 (*Brown*) [statement made two and a half hours after crime by declarant who "continued to labor mightily under the

emotional influence of the disturbing events he perceived"]; *Raley*, *supra*, 2 Cal.4th at pp. 893–894 [statement 18 hours after sexual assault, by victim who had been bleeding, suffered traumatic head injury, and was not far from death].) And section 1240 may encompass reports of criminal conduct made less promptly, but precipitated by some subsequent startling event. For example, a child's statement to her mother about sexual abuse that had occurred a day or two earlier was admissible because the child disclosed it immediately after her sore pubic area was reinjured during play. (*In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1700, 1713 (*Emilye A.*).) None of these cases undermines the rule that the statement must have been made while the reflective powers are still in abeyance due to the stress of excitement caused by perceiving an event.

But evidence that a declarant is under stress or in a state of high emotion while recounting a traumatic event is not enough—without the requisite link to a recent startling event—to establish a statement's admissibility. Illustrating that principle, our high court in *People v. Gutierrez* (2009) 45 Cal.4th 789 (*Gutierrez*) considered evidence of a child's statement to his aunt two months after his mother was killed. When the aunt told the three-year-old they were going to visit his mother's grave, the child said he would " 'untie' " his mother, and then recounted how " 'daddy and his mean friend tied up' " the mother. (*Id.* at p. 808.) "While making his statement, the child was crying, and 'scrunching up his face like he was angry.' " (*Ibid.*) The Supreme Court nonetheless concluded the statement should not have been admitted under section 1240. Distinguishing *Trimble*, the Court explained that the child in *Gutierrez* had had multiple secure opportunities to disclose the crime to other relatives, and that, although the child was crying and upset, "there [was] nothing to indicate that during the

14

two-month period following his mother's murder he had remained under the stress of excitement caused by witnessing the event and that his reflective powers were still in abeyance." (*Gutierrez*, at p. 812.)

### C. Analysis

#### 1. Admissibility

Under these standards, we are constrained to conclude Doe 1's statement to Shannon did not fall within the hearsay exception for spontaneous statements because she made it after considerable opportunity for deliberation and reflection. (See *Gutierrez, supra*, 45 Cal.4th at pp. 810–812.) Doe 1's initial words to Shannon were, " 'Mom, he's been molesting me,' " and she said—apparently "in that first statement"—that he had been doing so ever since she was 11 years old. Thus, Doe 1 described to her mother events that took place as much as five years earlier. We are aware of no California authority applying the spontaneous statement hearsay exception to such remote events.

We acknowledge that the passage of time need not prevent a statement from being spontaneous, but the cases establishing this principle involve delays of a couple of hours or a couple of days between the startling occurrence and the statement, not a period of years. (See *Brown, supra,* 31 Cal.4th at p. 541 [two and a half hours]; *Raley, supra*, 2 Cal.4th at pp. 893–894 [18 hours]; *Trimble, supra,* 5 Cal.App.4th at pp. 1229, 1235 [two days]; *In re Emilye A., supra*, 9 Cal.App.4th at p. 1713 [one or two days].) Indeed, our high court has explained that "allowing admission of a statement that was made approximately eight hours after the startling event may be the exception rather than the rule. (*People v. Merriman* (2014) 60 Cal.4th 1, 69 (*Merriman*).) And in each of the cases upholding application of the

15

spontaneous statement exception after a delay, the declarant was still laboring under the immediate influence of a startling event.

The Attorney General discusses the *Merriman* case at length, as if it supported admitting Doe 1's disclosure to Shannon. (See *Merriman*, *supra*, 60 Cal.4th at pp. 65–69.) On the contrary, *Merriman* discusses the admissibility of three different statements as potentially spontaneous, and none of its analysis supports the prosecution here. The adult declarant's first statement in *Merriman* was made just minutes after she was grabbed by the neck and choked. (*Id*. at pp. 65–66.) The lack of delay between that crime and its disclosure distinguishes the statement from our case. The second statement by the same declarant involved a disclosure to her mother on the morning after an attempted sexual assault. The Supreme Court declined to decide whether this statement had been properly admitted, assumed it had not, and concluded any error was harmless. (*Id*. at pp. 67–69.) Of course, an assumed error is of no help to the Attorney General here. The third statement was the same victim's account of the same attempted sexual assault, this time disclosed " 'within a few days' of the incident" to her girlfriend over the phone. (*Id*. at p. 70.) Although the declarant was "crying and upset" while disclosing the crime to her friend, the statement was properly not admitted as a spontaneous statement, the high court opined, as that "would have contravened the hearsay rule." (*Id*. at pp. 70–71.)

To be sure, it must have been exceedingly distressing for Doe 1 to reveal the pattern of molestation that had been taking place for years, but the substance of her disclosure falls outside the bounds of the exception for spontaneous statements. As with the child witness in *Gutierrez*, there is nothing to indicate that Doe 1's reflective powers were in abeyance throughout the extended time between the onset of the events she described

16

and her disclosure of them, even acknowledging that the events were exceedingly traumatic. (See *Gutierrez*, *supra*, 45 Cal.4th at p. 812.)

The Attorney General makes much of the final incident of sexual molestation, the day before Doe 1 disclosed to her mother. He posits this incident was the startling occurrence that caused Doe 1 fresh stress and made her disclosure to Shannon admissible. A problem with this theory is that Doe 1's disclosure to her mother was not about the events of the previous day; it was about a continuing pattern of conduct that took place over a period of years. (See *Poggi*, *supra*, 45 Cal.3d at p. 318 [" 'utterance must relate to the circumstances of the occurrence preceding it' "].) Indeed, the portion of Doe 1's statement that was most important to the prosecution's case was that the molestation had been ongoing since she was 11 years old. The record simply does not support a conclusion that Doe 1 disclosed this conduct " 'before there ha[d] been time' " to reflect on it. (*Ibid.*)

We are confirmed in this view by Doe 1's statements to the responding officer—made immediately after she spoke to her mother and while still very emotional—which show that Doe 1 not only had the *opportunity* to reflect on how to respond to defendant's molestation, she actually *did* reflect. She told the officer who came to the scene that two days previously she sat on the side of her bed and asked herself what she was doing with a man 20 years her senior, decided she no longer wanted to be involved with defendant, and asked to talk to him. The following day she gave him an ultimatum—" '[L]et me talk to your wife or I have to call the cops' "—because she understood defendant had been lying about his relationship with his wife. " 'I'm not stupid anymore,' " she warned. The trial court appears to have accepted the People's argument that Doe 1 spoke to Shannon under the stress of defendant "us[ing] her again sexually" after she concluded she "can't take it any more,"

17

but her own words in the same statement to the reporting officer show she reflected on how to stop defendant's molestation even *before* the final sexual encounter.

Doe 1's statements to the detectives later the same day underline that Doe 1 reflected on her decision to disclose the abuse to her mother. As she told the detectives, after a couple of days thinking about the problem she "figured that today I had to tell my mom finally," and then, before acting on that decision, she told defendant she would tell her mother and call the police because she no longer wanted to protect him, as he was lying to, and hurting, her. Nothing about this explanation, or any of Doe 1's other statements, focuses specifically on the final incident, as opposed to the years-long pattern, of defendant's sexual abuse.

The trial court refused to consider the full factual context for Doe 1's disclosure to Shannon, explaining it could not consider Doe 1's testimonial hearsay for context on her decision to disclose the molestation. But it is well established that the Confrontation Clause "limits the evidence a State may introduce *without limiting* the evidence a defendant may introduce. . . ." (*Giles v. California* (2008) 554 U.S. 353, 376, fn. 7, italics added.) And by concluding that Doe 1's statement to Shannon was precipitated by defendant "us[ing] her again sexually" "after her feeling like I can't take it any more," the trial court actually did rely on Doe 1's testimonial statement to the responding officer. Other portions of that statement show she deliberated on reporting the sexual abuse, and we see no basis for considering only part of the statement in determining whether Doe 1's words to Shannon were spontaneous. As for Doe 1's interview with the detectives, we note that at least one court has taken account of inadmissible testimonial hearsay for the limited purpose of considering whether a *different* statement qualified as

18

spontaneous under section 1240. (*Pirwani*, *supra*, 119 Cal.App.4th at pp. 774, 777, 786–787, 789–790; see also Evid. Code, § 1251 [statement by unavailable declarant of previously existing mental state of mind, including intent or plan, admissible to prove such state of mind where it is at issue in action].)

A trial court abuses its discretion when it "fails to consider a relevant factor that deserves significant weight." (*In re White* (2020) 9 Cal.5th 455, 470.) Doe 1's near-contemporaneous words to the police are directly relevant to her " 'mental state' " when she disclosed the abuse to Shannon—the " 'crucial element' " in determining whether the evidence fell within the hearsay exception for spontaneous statements. (*Raley*, *supra*, 2 Cal.4th at p. 892.) They show Doe 1's statement does not fall within the scope of section 1240.

We emphasize that we do not hold there could never be a circumstance in which disclosure of longstanding or ongoing sexual abuse could be treated as a spontaneous statement. A different question might be presented, for instance, if a child was too young to understand the nature of defendant's acts and reported them later, upon suddenly gaining that understanding. (See *People v. Brown* (1994) 8 Cal.4th 746, 758 [child victim may be "unaware of the wrongful nature of the conduct or that what has occurred is not 'normal' "].) But that is not the case before us, and we have no occasion to consider factual scenarios that might arise in other cases.

We thus conclude the trial court abused its discretion in finding Doe 1's statement to Shannon was a spontaneous outpouring made without deliberation and reflection. (See *Gutierrez, supra*, 45 Cal.4th at p. 812; *Ramirez, supra*, 143 Cal.App.4th at pp. 1524–1525.) We applaud Doe 1's bravery in speaking up to expose defendant's crimes and do not ignore her

19

anguish. But her statement to her mother that defendant had been abusing her for years was not admissible under section 1240.[3]

### 2. *Prejudice*

The Attorney General argues that any error in the admission of Doe 1's statement was harmless. Even if a trial court abuses its discretion in admitting hearsay evidence, we do not reverse unless there is a reasonable probability the defendant would have achieved a more favorable result absent the out-of-court statement. (*Merriman, supra*, 60 Cal.4th at p. 69; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

As to the counts alleging sexual crimes against Doe 1 occurring in the six-year period ending on the day she made her report—that is, counts 2, 3, 5, and 6—we conclude there is no showing of prejudice. There was abundant evidence of sexual contact between defendant and Doe 1, including physical evidence in the form of injuries to her genitals, her DNA on his genitals, his DNA on her breast, and his semen on the bedding in a room with her belongings. There were condoms and birth control pills in Doe 1's name in the apartment defendant rented; text message exchanges beginning in November 2016 indicating a romantic or sexual relationship, including one in which defendant told Doe 1 she needed "the pill"; and sexually explicit pictures of Doe 1 on defendant's phone. Finally, defendant admitted engaging in vaginal and oral sex with Doe 1 on multiple occasions beginning when she was 15 years old. In light of this overwhelming evidence of recent sexual relations with Doe 1, we see no possibility that defendant would have achieved a more favorable result on counts 2, 3, 5, or 6 if the jury had not heard of her statement to Shannon.

---

[3] We do not address the admissibility of any portion of Shannon's testimony other than her recounting of Doe 1's words to her.

There is no physical evidence directly supporting count 4, in which defendant was convicted of a lewd act on a child 14 or 15 years of age, but we similarly conclude there was no prejudice as to this count from admission of Doe 1's statement. Defendant admitted he had sexual relations with Doe 1 when she was 15 "[a]nd months," or "15 almost 16." In light of this admission and the other evidence of an ongoing sexual relationship, there is no reasonable probability the jury would not have convicted him on count 4 if it had not heard Doe 1's statement to Shannon.

As to the remaining count regarding Doe 1, however, we reach a different conclusion. In count 1, defendant was convicted of a lewd act on a child under the age of 14. Absent Doe 1's statement that the sexual abuse began when she was 11 years old, the evidence supporting this count is almost entirely Miguel's testimony. Miguel testified that defendant began spending time alone with Doe 1 in the evenings when she was 11 or 12 years old, saying they were going to the gym or to defendant's lounge bar; that they began to appear more comfortable together when Doe 1 was 12 years old; that Doe 1 became secretive about where she went with defendant and what they did; that defendant began dropping Doe 1 off around the corner instead of in front of her apartment; and that one evening when Doe 1 was 13 years old, she asked defendant in secret if she could call him " 'babe,' " and he responded by admonishing her to " 'keep it quiet,' " suggesting a romantic relationship he did not want known. In addition, a detective who investigated the case testified, based on his experience and training, that it was common for victims of child sexual abuse to show personality and behavioral changes around the time of the abuse. Defendant did not admit to any sexual contact with Doe 1 before she was 15 years old.

21

In our view, the admissible evidence would have been sufficient to support a conviction of committing a lewd act against a child under the age of 14. This is an offense that is " 'defined expansively to include contact "upon or with the [victim's] body, or any part or member thereof' "; it is not restricted to contact with specific or intimate body parts. (*People v. Lopez* (2010) 185 Cal.App.4th 1220, 1231; § 288, subd. (a).) The jury might reasonably have inferred from the totality of the evidence that defendant's romantic relationship with Doe 1 had already progressed to physical contact within the scope of section 288 before she reached the age of 14.

Nevertheless, the admissible evidence specific to that offense is not overwhelming. In particular, we do not know how the jury assessed Miguel's credibility. We thus conclude it is reasonably probable that, had the jury not heard Doe 1's statement that defendant had been molesting her since she was 11 years old, one or more of the jurors would have found the circumstantial evidence insufficient to establish beyond a reasonable doubt that defendant's lewd acts began before Doe 1 was 14 years old.

The conviction on count 1 must therefore be reversed. On remand the People may elect to retry defendant on count 1.

## II.    Corpus Delecti

Defendant contends the People did not establish the corpus delecti for his offenses against Doe 1. The corpus delecti rule " 'requires corroboration of the defendant's extrajudicial utterances insofar as they indicate a crime was committed, and forces the People to supply, as part of their burden of proof in every criminal prosecution, some evidence of the corpus delecti aside from, or in addition to, such statements.' " (*People v. Krebs* (2019) 8 Cal.5th 265, 317.) The purpose of this rule "is to assure that 'the accused is not admitting to a crime that never occurred.' [Citation.] The amount of independent proof of a

crime required for this purpose is quite small; [it has been] described . . . as 'slight' [citation] or 'minimal' [citation]. The People need make only a prima facie showing ' "permitting the reasonable inference that a crime was committed." ' [Citations.] The inference need not be 'the only, or even the most compelling, one . . . [but need only be] a *reasonable* one.' " (*People v. Jones* (1998) 17 Cal.4th 279, 301–302.)

That low standard is easily met here by the evidence we have already recited, which, independent of defendant's admission and Doe 1's statement to her mother, supports a reasonable inference of ongoing sexual contact between him and Doe 1. Defendant points out that the People's DNA expert did not offer an opinion about how defendant's DNA got onto Doe 1's breast or how her DNA got onto his genitals, and she testified that DNA could be transferred in any number of ways. These could include, defendant posits, Doe 1 and defendant transferring DNA by touching each others' hands, then transferring the DNA onto their own bodies through ordinary activities such as urination. But while that may be possible, it is also a reasonable inference that the DNA was transferred to genitals and breast through sexual activity—an inference that is all the more reasonable in light of the evidence that defendant rented an apartment where he could spend time with Doe, left his semen on the bedding in the room containing her belongings, and had on his phone texts and photographs that suggested a sexual relationship. Also, Miguel's testimony provides evidence that defendant's improper relationship with Doe 1 began before she was 14 years old. We accordingly reject defendant's challenge based on the corpus delecti rule.

## III.   Multiple Victim Enhancements

The jury found true allegations that there were multiple victims of defendant's four offenses of lewd acts against a child under the age of 14

23

(§ 288, subd. (a)), for purposes of sections 667.61, subd. (j)(2) and 1203.066, subd. (a)(7). One of those offenses, count 1, was against Doe 1, and three of them, counts 7, 8, and 9, were against Jane Doe 2. In pertinent part, section 667.61, subd. (j)(2) provides for a sentence of 25 years to life in prison for those who have committed a violation of section 288 against more than one victim (§ 667.61, subds. (c)(4), (e)(4), & (j)(2)), and section 1203.066 limits their eligibility for probation, suspension of sentence, or striking of enhancements (§ 1203.066, subd. (a)(7)).

Defendant contends these enhancements must be stricken because his conviction on count 1—the only violation of section 288 in which Doe 1 was the victim—was based on inadmissible hearsay. Because we conclude the conviction on count 1 must be reversed, we agree that the multiple victim enhancements must be conditionally reversed. If on remand defendant is again convicted on count 1, these multiple victim enhancements must be reinstated.

## IV. Statute of Limitations for Offenses Against Doe 2

Lozano's final contention also rests on the asserted inadmissibility of Doe 1's statement to Shannon.

The offenses against Doe 2, lewd acts on a child under the age of 14 (§ 288, subd. (a)), occurred between August 1997 and August 1998, so the ordinary six-year statute of limitations had long since run when defendant was charged with these crimes. (§ 800; see *People v. Smith* (1985) 171 Cal.App.3d 997, 1001.) However, this limitations period may be extended under certain circumstances. If a person of any age reports being a victim of a violation of section 288 and the normal limitations period has expired, a criminal complaint may be filed within one year if the crime involved substantial sexual conduct and "[t]here is independent evidence that

corroborates the victim's allegation.  If the victim was 21 years of age or older at the time of the report, the independent evidence shall clearly and convincingly corroborate the victim's allegation."  (§ 803, subd. (f)(1) & (2).) That evidence must be admissible at trial (§ 803, subd. (f)(3)), but it need not be sufficient to support a conviction.  (*People v. Ruiloba* (2005) 131 Cal.App.4th 674, 683.)

"Evidence of a person's propensity to do what the victim has alleged corroborates the victim's allegation."  (*Ruiloba, supra,* 131 Cal.App.4th at p. 683, citing *People v. Mabini* (2001) 92 Cal.App.4th 654, 659; see *People v. Zandrino* (2002) 100 Cal.App.4th 74, 85 ["evidence that the defendant committed a similar sexual offense against a different victim can indeed constitute sufficient corroboration for purposes of [former] section 803[, subd. ](g)"].)  And an act that "shows a defendant's *propensity* to commit sexual offenses against a child . . . [may] corroborate *all of the charged offenses* even if it does not *particularly* corroborate any specific offense." (*Ruiloba*, at p. 683.)

Doe 2 reported the crimes against her in 2017, and the complaint was filed against defendant on September 13, 2017.  The jury found the crimes involved substantial sexual conduct, so the only remaining question is whether there was sufficient independent corroboration to allow an extension of the limitations period under section 803, subdivision (f).

Part of the evidence offered to corroborate Doe 2's allegations was that defendant's behavior toward Doe 1 showed a propensity to commit such acts. In closing, the prosecutor pointed out parallels between the two sets of crimes:  both girls were vulnerable pre-teens or early teens when defendant began providing them with alcohol and taking them to hotel rooms for sex. With each, defendant cultivated a long-term relationship, hiding his own

25

family commitments and leading the girls to think of him as their boyfriend. The prosecutor also pointed out that Doe 2 said defendant used the same brand of condom that was found in the apartment on Garrity Way. The jury was instructed that if it concluded defendant committed sexual offenses against Doe 1, it could consider that as independent corroboration of Doe 2's allegations.

Based on his contentions that Doe 1's statement to Shannon was inadmissible and that therefore all of his convictions of sexual offenses against Doe 1 should fall, defendant contends there is no independent corroboration of Doe 2's allegation so as to extend the statute of limitation. This claim fails. The jury found defendant committed multiple sexual offenses against Doe 1, which it was instructed could be considered as independent corroboration of Doe 2's allegations, and we uphold all but one of defendant's convictions for sexual offenses against Doe 1. There was also evidence, through the testimony of Miguel, that beginning when Doe 1 was 11 or 12 years old, defendant's behavior toward her was inappropriate; he began spending time alone with her several evenings a week and their relationship had developed enough by the time she was 13 that she asked if she could call him " 'babe.' " The admissible evidence is ample to support the jury's finding that the statute of limitations was extended. Even without Doe 1's statement that the molestation began when she was 11 years old, we see no possibility the jury would have found Doe 2's testimony was not corroborated for purposes of section 803, subdivision (f).

## DISPOSITION

Defendant's conviction on count 1 is reversed. On remand, defendant may be retried on count 1 in a manner consistent with the views expressed in this opinion. The true findings as to the multiple-victim enhancement

allegations under sections 667.61, subdivision (j)(2) and 1203.066, subdivision (a)(7), related to counts 1, 7, 8, and 9, are conditionally reversed. If on remand defendant is again convicted on count 1, the multiple-victim enhancements shall be reinstated.  In all other respects, the judgment is affirmed.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Lozano* (A165646)

Trial Court:      Contra Costa County Superior Court

Trial Judge:      Hon. Terri A. Mockler

Counsel:      Barry L. Morris, under appointment by the Court of Appeal, for Defendant and Appellant

                    Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Heidi Salerno, Deputy Attorney General for Plaintiff and Respondent