Filed 5/27/26  P. v. Martinez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051682 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC316517) |
| v. | |
| WILLIAM VASQUEZ MARTINEZ, | |
| Defendant and Appellant. | |

Convicted by a jury of attempted premeditated murder, William Vasquez Martinez petitioned for resentencing under Penal Code section 1172.6.[1]  On appeal from the denial of his petition, Martinez argues that the trial court erred by finding beyond a reasonable doubt that he had the requisite intent to kill and aided and abetted the act of attempted murder.  He further contends that the court prejudicially erred by admitting the testimony of a gang expert, excluding his proffered 9-1-1 call, and giving preclusive effect to his conviction for assault with a deadly weapon.  Finding no prejudicial error, we will affirm.

## I.  BACKGROUND

The Santa Clara County District Attorney charged Martinez and Isaac Marquez with the attempted premeditated murder of R.M. (§§ 664, subd. (a), 187, 189; count 1), assault with a deadly weapon (a knife) on R.M. (§ 245, subd. (a)(1); count 2), assault with a deadly weapon (a knife) on M.F. (§ 245, subd. (a)(1); count 3), and assault with a

---

[1] Undesignated statutory references are to the Penal Code.

deadly weapon (an automobile) on both R.M. and M.F. (§ 245, subd. (a)(1); count 4). The district attorney further alleged that both defendants personally used a deadly weapon while committing the charged offenses (§ 12022, subd. (b)(1)), and that the offenses were committed for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)). The district attorney dismissed the charges against Marquez for insufficiency of evidence after R.M. expressed uncertainty about whether it was Marquez or Martinez's brother who perpetrated the attack alongside Martinez.

A jury convicted Martinez of the attempted premeditated murder of R.M., assault with a deadly weapon (knife) on R.M., and assault with a deadly weapon (automobile) on both R.M. and M.F. (counts 1, 2, and 4, respectively). The jury acquitted Martinez of assault with a deadly weapon (knife) on M.F. (count 3). The jury found true the allegation that Martinez personally used deadly weapons (knife and automobile, respectively) in the commission of counts 2 and 4, and that he committed the offenses for the benefit of, or in association with, a criminal street gang. The trial court sentenced Martinez to an indeterminate term of 15 years to life consecutive to a determinate term of one year, and a different panel of this court affirmed the judgment on appeal. (*People v. Martinez* (May 25, 2007, H029442) [nonpub. opn.].)

Martinez petitioned for resentencing in 2022. The district attorney conceded that Martinez's petition established a prima facie case for relief under section 1172.6 because the jury was instructed on the natural and probable consequences theory of attempted murder at trial. (§ 1172.6, subd. (a) [providing that any person convicted of "attempted murder under the natural and probable consequences doctrine" is eligible to petition for resentencing].) The matter proceeded to an evidentiary hearing, during which the trial court considered the record of the trial and preliminary hearing.

A.    *In Limine Motions*

Martinez moved to exclude the trial testimony of San Jose Police Detective Nicholas Speaks, who testified as an expert in "Hispanic criminal street gangs."

2

Martinez contended because the gang enhancements were not at issue, Speaks's testimony is not relevant, and even if relevant, should be excluded for its prejudicial impact. The trial court denied the motion.

Martinez sought to admit a transcript of a prior 9-1-1 call by witness P.J. as a spontaneous statement under Evidence Code section 1240. According to dispatch records, P.J. made the call one hour and 20 minutes after the attack. P.J. described seeing one person punch another before walking away. P.J. did not see a knife and was unaware anyone had been stabbed until he saw police and ambulance on scene and heard an officer say that someone had been stabbed. P.J. informed dispatch there might be surveillance cameras in the area and advised, "You guys can go over there and get the videotape." The trial court found that P.J.'s statements to 9-1-1 did not qualify as a spontaneous utterance and excluded the transcript.

## B.    *Admitted Evidence*

The parties relied on the trial and preliminary hearing evidence,[2] but the district attorney recalled Speaks to authenticate a series of photographs previously admitted at Martinez's trial.

On the morning of June 12, 2003, M.F. was driving in a white Subaru with his friend, R.M., in the front passenger seat. M.F. had been a member of a Sureño street gang and had an associated tattoo on his face. Martinez pulled up alongside and his passenger, Marquez, displayed four fingers, which M.F. recognized as a rival gang sign. Either Marquez or Martinez shouted "[S]crap," a derogatory Norteño term for a Sureño.

---

[2] For the first time at oral argument, Martinez asserted that *People v. Houck* (1998) 66 Cal.App.4th 350 prohibited reliance on preliminary hearing evidence when the conviction was obtained by jury trial. *Houck* does not address the admissibility of prior testimony, only whether preliminary hearing testimony is part of the " 'record of conviction' " when the conviction was the product of a jury verdict. (*Id*. at pp. 354–355.) The evidence the Legislature has made admissible under section 1172.6, subdivision (d)(3) is plainly not limited to the record of conviction.

M.F. responded by flipping off the two men and accelerating, but Martinez pursued and began ramming M.F.'s car from the sides and rear. M.F. estimated that Martinez pursued him for "five or 10 minutes" and rammed his car between three to five times. M.F. was forced to stop at a red light and felt Martinez ram his car from the back at approximately "40 or more miles per hour." The impact caused M.F.'s car to hit the truck stopped in front of him.

Immediately after the collision, Martinez and Marquez emerged from their car, each with a hunting knife in hand. Martinez ran toward M.F.'s side of the car; Marquez ran toward R.M. M.F. jumped out and fled, with Martinez briefly in pursuit. But R.M.'s seatbelt, locked in the collision, trapped him inside the car.

Abandoning his pursuit of M.F., Martinez returned to the car and helped Marquez open the passenger's side door. Martinez helped Marquez pull R.M. from the car. Marquez began stabbing R.M. as he struggled to get away. At one point, Martinez told Marquez, " '[L]et's go,' " but the two men did not immediately leave and continued the attack.[3] R.M. managed to get out of the car and while fleeing heard Martinez tell Marquez, " 'Get him,' " " 'Grab him,' " or words to that effect. Both men pursued R.M. but neither caught him. R.M. ducked into a nearby store to seek help. In total, Marquez stabbed R.M. five times, including once in the chest.

Speaks, the prosecution's gang expert, provided background information on the Norteño and Sureño street gangs as context for the incident culminating in R.M.'s stabbing. Norteño street gang members identify with the Nuestra Familia while Sureño gang members fall under the umbrella of La Eme. Norteños wear red, associate with the

---

[3] At trial, R.M. initially recalled only Marquez attacking him and testified that Martinez was on the other side of the street, chasing M.F. Based on his prior statements to police and his testimony at the preliminary hearing, however, R.M. clarified that both Martinez and Marquez were together and communicating with each other during the attack.

number 14, and view Sureños as their sworn enemies and "archrivals." Norteño gang members will commonly "flash '4' "—display four fingers—to symbolize the number fourteen. Their primary activities include committing violent assaults, robberies, and murders.

At the time of the stabbing, Martinez and Marquez wore clothes and had tattoos identifying them as Norteño gang members. Martinez also had a "Mongolian hair style" commonly worn by Norteño gang members, and he had previously admitted to membership in various Norteño subsets.[4] Speaks opined from Marquez's display of four fingers and the use of the "scrap" epithet that R.M.'s stabbing was gang motivated. In Speaks's view, M.F., by flipping off the defendants, issued "a direct challenge" that could not go unanswered if Martinez and Marquez hoped to maintain respect within the gang. Speaks opined that a challenge to one gang member required all other gang members present to "confront the threat and assist one another" or risk being perceived as a coward. It is "very common" for gang members working together to communicate in advance about what they are going to do: "[L]ike a sports team; they plan their operation out before they get there."

## C.   *Order Denying Resentencing*

The trial court denied Martinez's resentencing petition, finding beyond a reasonable doubt that Martinez remained guilty of attempted premeditated murder under current law.

Martinez timely appealed.

---

[4] Martinez on appeal does not renew his claim that Speaks's testimony included case-specific hearsay inadmissible under *People v. Sanchez* (2016) 63 Cal.4th 665.

## II.     DISCUSSION

**A.     *Sufficiency of the Evidence***

Martinez argues that insufficient evidence supports the trial court's findings that he harbored the requisite intent to kill and that he aided and abetted the act constituting the murder attempt.  We review a trial court's denial of a section 1172.6 petition for substantial evidence.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)  Under this standard, we " ' " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " ' " (*People v. Underwood* (2024) 99 Cal.App.5th 303, 314.)  "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)[5]

Although section 188 has been amended to abrogate certain theories of imputed malice, current law still permits an accomplice to be convicted of murder or attempted murder as a direct aider and abettor.  (*People v. Coley* (2022) 77 Cal.App.5th 539, 548.) "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing— which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

---

[5] Relying on *People v. Vivar* (2021) 11 Cal.5th 510, Martinez argues for de novo review of factual findings because the court denied the petition based "on a 'cold' documentary record."  *Vivar* is inapposite.  The central issues in *Vivar* were "[w]hether counsel's advice regarding immigration was inadequate and whether such inadequacy prejudiced the defense," which "while mixed questions, are predominantly questions of law." (*Id.* at p. 524.)  "[T]he issue here," however, "is a factual one traditionally afforded substantial evidence review." (*People v. Njoku* (2023) 95 Cal.App.5th 27, 43.)

Both of Martinez's contentions—that he lacked the intent to kill and did not assist in the actus reus constituting the attempted murder—require us to accept the same factual premise: that he was not present at the car and did not assist Marquez during the stabbing. Essentially, Martinez urges us to accept R.M.'s testimony at trial that he only saw Marquez stabbing him and pulling him out of the car, and to discount all other testimony (including other portions of R.M.'s) that place Martinez at the car with Marquez during R.M.'s attack. But " '[a] reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*Albillar*, *supra*, 51 Cal.4th at p. 60.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid.*)

Substantial evidence supports the trial court's finding that Martinez directly aided Marquez in the stabbing of R.M. In so finding, the trial court was entitled to rely on M.F.'s testimony that he saw Martinez help Marquez open the passenger's side door and attempt to pull R.M. from the car—all while observing Marquez repeatedly stabbing R.M. And despite the inconsistencies in R.M.'s testimony, the court permissibly relied on R.M.'s preliminary hearing testimony that Martinez told Marquez to " '[g]et him' " or " '[f]ollow him,' " and R.M.'s correction of his initial trial testimony—namely, his ultimate agreement that both Martinez and Marquez were present and communicating with each other as he was being stabbed.

Substantial evidence likewise supports the trial court's finding that Martinez shared Marquez's intent to kill. At the hearing, the evidence was undisputed that once M.F. responded to Marquez's initial provocation, Martinez pursued the victims' car for "five or 10 minutes"—which, taken together with Speaks's testimony that gang members often work together and "plan their operation out before they get there"—permits a reasonable inference that the two men used that time to coordinate their attack. It was also undisputed that Martinez rammed the victims' car multiple times—including once at

7

"40 or more miles per hour" while the victims were trapped at a red light—effectively disabling the victims' best means of evasion. Martinez armed himself with a knife before getting out of his car, and from the manner in which he and Marquez simultaneously ran at the victims, the trial court was entitled to find that the two men were executing on a "well-orchestrated" attack "reflective of a premeditated plan and shared intent to kill." Speaks supplied additional evidence relevant to Martinez's motive and intent when he opined that M.F. and R.M. were "perceive[d] to be Sureño gang members" and therefore sworn enemies of Norteños; that M.F., by flipping off the defendants, presented a "direct challenge" that demanded an answer; that gang conflicts frequently escalated into assaults with a deadly weapon, attempted murders, and murders; and that gang members are less interested in fighting fair but will "act as violently as they can to overcome their enemy".

Viewed in the light most favorable to the judgment, substantial evidence supports the trial court's findings that Martinez both aided in the actus reus constituting the attempted premeditated murder, and shared Marquez's intent to kill.

**B.** **_Evidentiary Contentions_**

Martinez's claims of evidentiary error are likewise unavailing. We review a trial court's decision to admit or exclude evidence for abuse of discretion. Where the decision turns on predicate factual questions, we review the trial court's findings for substantial evidence. (_People v. Phillips_ (2000) 22 Cal.4th 226, 236.)

**1.** **_Speaks's Gang Testimony_**

" ' " '[A] trial court's ruling [under Evidence Code section 352] will not be disturbed, and reversal … is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (_People v. Chhoun_ (2021) 11 Cal.5th 1, 26 (_Chhoun_).)

As Martinez observes, the scope of evidence admissible to prove gang enhancements has changed since his trial in 2004. But gang evidence "is admissible even

8

when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1095; *People v. Garcia* (2024) 107 Cal.App.5th 1040, 1049 (*Garcia*).) " 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 31.)

Whether Martinez possessed the intent to kill was heavily disputed at the evidentiary hearing, and Speaks's testimony was probative in that it provided a motive for an otherwise random act. (*Chhoun*, *supra*, 11 Cal.5th at p. 32 ["While not itself an element of the crimes, motive can illuminate intent"].) Speaks proffered (1) a reason for Marquez to provoke M.F. by displaying a Norteño gang sign; (2) an explanation for the rapid escalation into violence; and (3) a theory—which the fact finder was free to accept or reject—as to why Martinez might have helped Marquez plan and commit attempted murder. " ' " '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect.' " ' " (*Chhoun*, at p. 32.)

To be sure, the trial court retained discretion to exclude the gang evidence to the extent "its probative value [was] substantially outweighed by the probability that its admission will create substantial danger of undue prejudice." (*Garcia*, *supra*, 107 Cal.App.5th at p. 1050.) But we find no abuse of discretion in the court's admission of the evidence here. The redacted portions of Speaks's testimony were limited to background information regarding the rival gangs, Speaks's opinion that the defendants were Norteño gang members, his explanation of gang relations and their potential for rapid escalation into lethal violence, and his proposed reasons for why Martinez might have felt obligated to assist in the planning and execution of those violent acts. And because the trier of fact here was a judge, not a jury, we "presume that a professional

9

jurist is capable of weighing admissible evidence without being prejudiced by extraneous matters." (*People v. Walkkein* (1993) 14 Cal.App.4th 1401, 1408.)

### 2.    *Proffered 9-1-1 Call*

Nor do we perceive any abuse of discretion in the trial court's exclusion of P.J.'s 9-1-1 call under Evidence Code section 1240.

To be admissible as a spontaneous utterance, the statement must first "[p]urport[] to narrate, describe, or explain an act, condition, or event perceived by the declarant"; and second, be "made spontaneously, while the declarant [is] under the stress of excitement caused by such perception." (Evid. Code § 1240, subds. (a) & (b).) "When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity." (*People v. Poggi* (1988) 45 Cal.3d 306, 319.) But the "crucial element in determining whether a declaration is sufficiently reliable to be admissible under [Evidence Code section 1240] is … the mental state of the speaker." (*People v. Trimble* (1992) 5 Cal.App.4th 1225, 1234–1235.)

The trial court excluded P.J.'s statements to 9-1-1 dispatch upon finding that the statements were not made "under the stress of excitement caused by [the] perception" of R.M.'s attack. P.J. explained that he initially believed R.M. was merely getting "beat up," and "didn't think nothing of it." Instead, P.J. went to the store for a sandwich, waited for the bus, and only became curious upon hearing sirens. P.J. explained that he decided to call 9-1-1 sometime after learning from an officer at the scene that R.M. had been stabbed. P.J.'s stated reason for calling was that it later occurred to him that "there's cameras at the Vietnamese restaurant that points exactly at that area," so he thought, "You guys can go over there and get the videotape." And call records showed that P.J. did not make the call until over an hour after the incident. Under these circumstances, substantial evidence supports the trial court's finding that P.J.'s statements were not uttered "under the stress of excitement," and the court did not abuse its discretion in excluding them.

10

Martinez also argues that even if P.J.'s statements are not admissible under Evidence Code section 1240, the trial court should have admitted them under *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*), and that failure to do so violated his due process rights. We disagree.

The circumstances of *Chambers* are highly distinguishable, involving the trial court's exclusion of a (later repudiated) third party confession corroborated both by independent witnesses and other evidence. (*Chambers*, *supra*, 410 U.S. at p. 300.) Moreover, the United States Supreme Court subsequently observed: "*Chambers* was an exercise in highly case-specific error correction … [T]he holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." (*Montana v. Egelhoff* (1996) 518 U.S. 37, 52–53; see also *United States v. Scheffer* (1998) 523 U.S. 303, 316 [similar].) And the California Supreme Court has observed that after *Chambers*, the "general rule remains that ' "the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense" ' " and that " ' "[c]ourts retain … a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." ' " (*People v. Lawley* (2002) 27 Cal.4th 102, 155.)

## C.     *Issue Preclusion*

Finally, Martinez argues that the trial court erroneously relied on Martinez's assault with a deadly weapon conviction (count 4) to find that he harbored an intent to kill. Section 1172.6 "does not prohibit the consideration of jury findings—and in fact affirmatively contemplates it." (*People v. Curiel* (2023) 15 Cal.5th 433, 451; *People v. Strong* (2022) 13 Cal.5th 698, 715 ["the structure of [section 1172.6] … [citation], … strongly suggests the Legislature contemplated that many, and perhaps most, [jury]

findings would be given effect on resentencing"].)  But to the extent Martinez contends that the court was barred from using the fact of conviction to infer an intent to kill, we agree that the ultimate fact of his intent under current law was not " 'necessarily decided in the former proceeding' " and that the verdict on count 4 is not preclusive.  (*Strong*, at p. 716.)  We do not, however, read the trial court's passing reference to Martinez's assault conviction as an inference of intent; in context, the court was merely explaining its rejection of Martinez's claim that he had played no more than a minimal role in the incident.

### III.   DISPOSITION

The judgment is affirmed.

_____

LIE, J.

WE CONCUR:

_____

GROVER, Acting P. J.

_____

CHUNG, J.*

*People v. Martinez*
H051682

_____

*Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.